MARY BAUMGARTNER, Ex'r of the Estate of John Baumgartner, Deceased, Plaintiff-Appellant, v. THE FIRST CHURCH OF CHRIST, SCIENTIST, *et al.*, Defendants-Appellees.

First District (1st Division)  No. 84—1731

Opinion filed March 4, 1986.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Perry L. Fuller, D. Kendall Griffith, Milo W. Lundblad, and Joanna C. New, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Max Wildman, Robert E. Kehoe, Jr., and Jane A. Zimmerman, of counsel), for appellee The First Church of Christ, Scientist.

Matthews, Dean, Simantz, Hem & Whitt, of Aurora (Stuart L. Whitt, Ronald M. Hem, and Susan L. Schneider, of counsel), for appellee The Northern Trust Company.

French, Rogers, Kezelis & Kominiarek, of Chicago (Richard G. French, Gilbert J. Rogers, and Russell P. Veldenz, of counsel), for appellee Ruth L. Tanner.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, Mary Baumgartner, as executor of the estate of John Baumgartner, deceased, brought an action for wrongful death against the First Church of Christ, Scientist (Mother Church), Ruth L. Tanner, and the Northern Trust Company, as executor of the estate of Paul A. Erickson, deceased. Plaintiff's action arises out of Christian Science treatment rendered to decedent by Tanner and Erickson. Defendants filed a motion to strike and dismiss the complaint pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—619). The motion was granted and plaintiff appeals. For the reasons set forth below, we affirm.

■ Initially, we observe that Christian Science is a widely known religion and courts will take judicial notice of its general teachings. (*Northern Trust Co. v. Commissioner of Internal Revenue* (7th Cir. 1940), 116 F.2d 96, 98.) Its basic premise, as plaintiff acknowledges in her pleading,, is that physical disease can be healed by spiritual means alone. As stated in an article on Christian Science from the Encyclopedia Britannica (4 Encyclopedia Britannica *Macropaedia* 562-65 (15th ed 1984)):

> "Christian Science is a religious denomination founded in the United States in 1879 by Mary Baker Eddy (1821-1910), author of the book that contains the definitive statement of its teaching, *Science and Health with Key to the Scriptures*. About one-third of its nearly 3,000 congregations are located in 56 countries outside the United States, with membership concentrated in areas with strong Protestant traditions. It is widely known for its practice of spiritual healing, an emphasis best understood in relation to its historical background and teaching.
> * * *

The cure of disease through prayer is seen as a necessary element in a full redemption from the flesh. Church historian Karl Holl summarizes the concept of treatment, or prayer, in Christian Science as 'a silent yielding of self to God, an ever closer relationship to God, until His omnipresence and love are felt effectively by man,' and he distinguishes this decisively from willpower or mental suggestion."

We further note that the present appeal is before this court on a motion to dismiss which admits all well-pleaded facts in plaintiff's complaint. (*Magana v. Elie* (1982), 108 Ill. App. 3d 1028, 439 N.E.2d 1319.) Consequently, in reviewing the arguments on appeal, the following factual allegations contained in plaintiff's complaint are admitted as true.

Plaintiff's fourth amended complaint alleged that on October 13, 1974, the decedent, plaintiff's husband, contracted acute prostatitis. The illness manifested itself through severe pain in the groin area and the inability to urinate. Decedent immediately contacted Paul Erickson and advised him of his illness. Decedent requested that Erickson provide him with Christian Science treatment. Erickson, a Christian Science practitioner, had provided decedent with Christian Science healing on several prior occasions. He was also plaintiff's teacher and advisor on Christian Science. Erickson had been instructed by the Mother Church in the methods of Christian Science healing and was listed in *The Christian Science Journal*, a publication of the organization. By listing practitioners in the journal, the Mother Church certifies their training and competence.

Erickson came to decedent's home shortly after being contacted and administered hot baths and Christian Science treatment. Erickson also "massaged and manipulated" decedent's prostate gland. For the next several days, decedent's condition remained unchanged. Erickson therefore contacted defendant Ruth Tanner and directed her to go to decedent's home to assist in rendering Christian Science healing. Tanner was a Christian Science nurse certified by the Department of Care of the Mother Church and was also listed in its journal. Tanner proceeded to provide Christian Science treatment to decedent. Erickson called daily to check on decedent's condition and he visited frequently to provide healing.

Decedent's condition began to deteriorate. Plaintiff alleges that decedent decided he wanted medical treatment for his illness and that he no longer wished to be treated by Tanner and Erickson. She further alleges that when Erickson was advised of this request, he told decedent that he would die if a medical doctor was called and assured

decedent that he was being cured by Christian Science healing. Decedent and plaintiff did not call in a medical doctor and instead continued with the Christian Science healing provided by Tanner and Erickson. Decedent's condition further deteriorated, and he died on October 23, 1974, 10 days after he became ill.

At the time of his death, decedent had been a wealthy inventor and industrialist. He was survived by plaintiff and his two minor children. The complaint alleges that prior to his death, decedent changed his will at the insistence of Erickson and made the Mother Church a residual beneficiary of approximately one-half of his multi-million-dollar estate.

Plaintiff thereafter initiated a wrongful death action against the Mother Church, Tanner, and Erickson, who is now deceased. The pleading before this court is plaintiff's fourth amended complaint which contains five counts. Count I alleges ordinary negligence, count II alleges intentional/reckless misconduct, count III seeks recovery for medical malpractice and count IV sets forth a Christian Science malpractice claim. Count V is directed only against the Mother Church for a constructive trust. The trial court dismissed the entire fourth amended complaint for failure to state a cause of action. The dismissal was based on first amendment grounds. On appeal, plaintiff challenges the dismissal of all five counts. The issues raised on appeal are matters of first impression in this State.

## I

■ We first address the propriety of the trial court's dismissal of the count in plaintiff's complaint seeking recovery for medical malpractice. This claim is based on the premise that Erickson and Tanner were under a legal duty to comply with the standards of diagnosis and care that are imposed upon members of the medical profession even though they had been retained by decedent for Christian Science treatment. We find no merit to plaintiff's claim. Legislative and judicial distinctions between medical and spiritual treatment belie the existence of any such duty.

Our State legislature recognized the fundamental difference between spiritual treatment of human ailments and medical treatment when it enacted the Medical Practice Act. (Ill. Rev. Stat. 1983, ch. 11, par. 4474.) This act exempts religious treatment from licensing, testing and other regulation. (Ill. Rev. Stat. 1983, ch. 111, par. 4474.) Specifically, section 37 (par. 4474) provides that the Act does not apply to "persons treating human ailments by prayer or spiritual means as an exercise or enjoyment of religious freedom." Similarly, nurses

who provide "care of the sick where treatment is by prayer or spiritual means" are expressly exempt from the requirement that all nurses be licensed. (Ill. Rev. Stat. 1983, ch. 111, par. 3402.) It follows that persons in these categories, exempt as a matter of public policy from the statutory framework which sets up standards for the medical profession, may not be held liable for failing to comply with medical standards to which they are not subject.

The argument that Christian Science practitioners should be held to medical standards has been expressly rejected by the New Hampshire Supreme Court. (*Spead v. Tomlinson* (1904), 73 N.H. 46, 59 A. 376.) There, the court affirmed a directed verdict for a Christian Science practitioner where the plaintiff sought to recover for medical malpractice. In so holding, the court noted that the plaintiff knew that the defendant was not a member of the regular school of physicians and did not practice according to its methods, but instead was a Christian Scientist and practiced according to the methods recognized by such healers. The *Spead* court reasoned:

> "As is said in Story on Bailments (s. 435): 'If a person will knowingly employ a common matmaker to weave or embroider a fine carpet, he must impute the bad workmanship to his own folly. So, if a man who has a disorder of his eye should employ a farrier to cure the disease, and he should lose his sight by using the remedy prescribed in such cases for horses, he would certainly have no legal ground of complaint.' And in cases involving the liability of medical practitioners, courts have held that 'If there are distinct and differing schools of practice, as allopathic or old school, homeopathic, Thompsonian, hyropathic [*sic*] or water cure, and a physician of one of those schools is called in, his treatment is to be tested by the general doctrines of his school, and not by those of other schools.' [Citations.]" 73 N.H. 46, 51, 59 A. 376, 378.

Our supreme court has adopted the key principle upon which the *Spead* decision was predicated: that a plaintiff may not successfully establish a standard of care for one health care specialty offering the testimony of someone who practices a different specialty. (*Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13.) In *Dolan*, it was held that the standard of care for a podiatrist may not be established through a physician or surgeon.

Here, plaintiff does not allege that Erickson or Tanner held themselves out to decedent as medical practitioners, nor that decedent expected or asked them to render medical treatment. As plaintiff concedes in her complaint, followers of Christian Science do not use

medical aid to treat illness, but instead rely solely upon spiritual means. Decedent specifically requested Christian Science treatment when he became ill and could not have reasonably expected anything other than spiritual healing from Tanner and Erickson. There is no allegation that decedent was incompetent prior to his death. Viewing these facts and circumstances in light of the authorities cited above, we find that plaintiff cannot state a cause of action for medical malpractice.

## II

We next consider plaintiff's count based on a theory of Christian Science malpractice. Specifically, plaintiff alleges that Erickson and Tanner deviated from the standard of care of an ordinary Christian Science practitioner and nurse when they treated decedent. We find no basis for recovery under such a theory.

■ The United States Constitution dictates that the only entity with the authority and power to determine whether there has been a deviation from "true" Christian Science practice is the Christian Science Church itself. As the United States Supreme Court has held, the first amendment bars the judiciary from considering whether certain religious conduct conforms to the standards of a particular religious group. (*Thomas v. Review Board* (1981), 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425; *Serbian Eastern Orthodox Diocese for the United State of America v. Milivojevich* (1976), 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372.) In *Thomas*, it was held that probing the proper interpretation of religious beliefs "is not within the judicial function and judicial competence" and that "[c]ourts are not arbiters of scriptural interpretation." (*Thomas v. Review Board* (1981), 450 U.S. 707, 716, 67 L. Ed. 2d 624, 632, 101 S. Ct. 1425, 1431.) Similarly, in the *Milivojevich* case, the United States Supreme Court reversed a decision by the Illinois Supreme Court, holding that the court improperly inquired into the propriety of the removal of a bishop from his post and the reorganization of the church diocese.

In Illinois, with the exception of *Milivojevich*, there has been a long standing reluctance on the part of our courts to adjudicate religious disputes. From very early on, Illinois courts have consistently declined to entertain cases involving the interpretation of religious doctrine. (See, *e.g., Chase v. Cheney* (1871), 58 Ill. 509; *Fussell v. Hail* (1908), 233 Ill. 73; *Pfeifer v. Christian Science Committee on Publications* (1975), 31 Ill. App. 3d 845, 334 N.E.2d 876.) In *Chase*, our supreme court refused to become involved in the question of whether an Episcopal minister had deviated from the Book of Common Prayer.

The *Chase* court stated:

> "*** We do not aspire to become *de facto* heads of the church, and, by construction or otherwise, abrogate its laws and canons. We shall not inquire whether the alleged omission is any offense. *This is a question of ecclesiastical cognizance. This is no forum for such adjudication.* The church should guard its own fold; enact and construe its own laws; enforce its own discipline; and thus will be maintained the boundary between the temporal and spiritual power." (Emphasis added.) (*Chase v. Cheney* (1871), 58 Ill. 509, 535.)

The *Chase* court further observed that "[f]reedom of religious profession and worship can not be maintained, if the civil courts trench upon the domain of the church, construe its canons and rules, dictate its discipline, and regulate its trials." 58 Ill. 509, 537.

The *Chase* case was later cited in *Fussell v. Hail* (1908), 233 Ill. 73. In *Fussell*, the plaintiffs were members of the Cumberland Presbyterian Church and were opposed to the union of that church with the Presbyterian Church in the United States of America. The plaintiffs sought a declaration that Cumberland could not, under the church constitution, consummate the union. The supreme court, in affirming the dismissal of the action, stated:

> "A court of chancery has no jurisdiction of the subject matter of this controversy. The object of the bill is to have a court of chancery, by its process, assume control of the action of an ecclesiastical tribunal, declare the extent of its jurisdiction, examine the regularity of its proceedings and revise its judgments. The civil courts deal only with civil or property rights. *They have no jurisdiction of religious or ecclesiastical controversies.* Our constitution says: 'The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed.' Such freedom of religious profession and worship cannot be maintained if the civil courts may interfere in matters of church organization, creed and discipline, construe the constitution, canons or rules of the church and regulate and revise its trials and the proceedings of its governing bodies. [Citations.]" (Emphasis added.) (*Fussell v. Hail* (1908), 233 Ill. 73, 77.)

More recently, in *Pfeifer v. Christian Science Committee on Publications* (1975), 31 Ill. App. 3d 845, 334 N.E.2d 876, this court followed *Chase* and *Fussell* when it affirmed the dismissal of a complaint alleging that a Christian Science practitioner's lessons deviated from the tenets of Christian Science. We held in *Pfeifer* that we lacked jurisdic-

tion under the first amendment to determine whether the practitioner's teachings conformed to those of Christian Science founder Mary Baker Eddy. 31 Ill. App. 3d 845, 846, 334 N.E.2d 876.

As in each of the above-mentioned cases, adjudication of the present case would require the court to extensively investigate and evaluate religious tenets and doctrines: first, to establish the standard of care of an "ordinary" Christian Science practitioner; and second, to determine whether Erickson and Tanner deviated from those standards. We believe that the first amendment precludes such an intrusive inquiry by the civil courts into religious matters.

At oral argument before this court, counsel for plaintiff acknowledged that any inquiry into Christian Science beliefs would be precluded by the first amendment. He urged, however, that defendants' conduct can be objectively evaluated by a court of law without such an inquiry. In support of this contention, counsel relied on article VIII, paragraph 23, of the Manual of The Mother Church which provides that "[i]f a member of this Church has a patient whom he does not heal, and whose case he cannot fully diagnose, he may consult with an M.D. on the anatomy involved." Significantly, this section does not require that a practitioner *must* consult with a medical doctor—it merely provides that he *may* do so. For a court of law to determine whether Erickson and Tanner violated the above tenet, it would first need to interpret the permissive language of this religious doctrine promulgated by the Mother Church. As noted above, an inquiry of this precise nature was expressly forbidden by this court in *Pfeifer v. Christian Science Board Committee on Publications* (1975), 31 Ill. App. 3d 845, 334 N.E.2d 876.

Plaintiff in her brief relies on *Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438, *Cox v. New Hampshire* (1941), 312 U.S. 569, 85 L. Ed. 1049, 61 S. Ct. 762, and *Reynolds v. United States* (1878), 98 U.S. 145, 25 L. Ed. 244. In *Prince*, it was held that the use of children to sell church literature violated a statute prohibiting child labor. In *Cox*, the court held that parades for religious purposes did not excuse a church group from obtaining a permit. *Reynolds* held that the religious practice of polygamy violated State law.

■ We find each of the above cases distinguishable from the present case. In each instance, the wrongful conduct, although religiously motivated, could be analyzed without first evaluating the tenets of a particular religion. Moreover, the polygamous marriage bans were upheld in *Reynolds* because the practice consisted of overt acts determined to be deleterious to public morals and welfare. No such overt, immoral activity is involved in this case.

Plaintiff also cites *Jacobson v. Massachusetts* (1905), 197 U.S. 11, 49 L. Ed. 643, 25 S. Ct. 358, where an individual's claim of exemption from compulsory small pox vaccination was denied because the State's interest in public health was superior. We find this case to be inapposite since society can protect itself from the danger of loathsome and contagious disease, an issue which is not now before us.

We find none of the above authorities cited by plaintiff to be persuasive analogy. The question of whether or not defendants deviated from the standard of care of an ordinary Christian Scientist is not a justiciable controversy. Accordingly, the trial court properly dismissed plaintiff's count seeking recovery for Christian Science malpractice.

## III

■ Next, we consider whether the trial court correctly dismissed plaintiff's count based on ordinary negligence. Plaintiff alleged that Erickson and Tanner were negligent because they failed to withdraw from treating decedent when requested to do so; failed to withdraw when they knew or should have known Christian Science treatment was not curing decedent; failed to consult a medical doctor when they knew or should have known Christian Science treatment was not curing decedent's illness; failed to consult a medical doctor when requested to do so and when they knew decedent was going to die without medical treatment; advised decedent not to obtain medical care; coerced decedent into not calling in a medical doctor; misrepresented to decedent that the Christian Science treatment was working; and breached a fiduciary relationship.

To set forth a cause of action sounding in negligence, a plaintiff must allege the existence of a duty of reasonable care owed plaintiff by defendant, breach of that duty and injury proximately resulting from the breach. (*Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 466 N.E.2d 1261.) The existence of a duty is a matter of law, to be decided by the court. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535.) In deciding whether a duty exists, the court is to consider the reasonable foreseeability of the injury, public policy and social requirements, the magnitude of the burden of guarding against injury and the consequences of placing that burden upon the defendant. *Morgan v. Dalton Management Co.* (1983), 117 Ill. App. 3d 815, 454 N.E.2d 57.

Applying these principles to the case at hand, we find that plaintiff's negligence claim must fail. For the court to determine whether defendants breached any duty owed to decedent would require a searching inquiry into Christian Science beliefs and the validity of

such beliefs. As established above, such an inquiry is precluded by the first amendment.

We recognize that plaintiff alleges in her complaint that Erickson and Tanner persuaded decedent and his family not to call in a medical doctor through "coercion" and "intimidation." Such allegations, however, are merely conclusionary. Plaintiff does not allege that decedent was not rational or mentally incompetent. Nor does she allege that decedent or herself was physically imprisoned by defendants and thus unable to contact a physician. The facts as alleged by plaintiff fail to show that the Christian Science treatment provided to decedent, a competent adult, was not a matter of his own choice and free will at all times prior to his death. Our supreme court has made it clear that a competent adult has the right under the first amendment to refuse medical treatment when it conflicts with his religious beliefs. *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 205 N.E.2d 435.

Accordingly, we conclude that plaintiff has failed to state a cause of action for negligence and that the trial court properly dismissed plaintiff's negligence count.

## IV

We next consider plaintiff's count alleging that defendants acted with intentional or reckless disregard for decedent's health and safety. The allegations in this count are virtually identical to those in the count premised on ordinary negligence. Plaintiff merely added the words "acted intentionally or with reckless disregard." We believe that the same rationale which caused plaintiff's negligence count to fail also causes the intentional/reckless disregard count to fail. Whether or not defendants negligently or intentionally applied church doctrine is not a justiciable controversy.

## V

Finally, we turn to the allegations in count V, which seeks to impose a constructive trust against the Mother Church. "A constructive trust is a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." (*Sadacca v. Monhart* (1984), 128 Ill. App. 3d 250, 255, 470 N.E.2d 589.) A constructive trust "arises by operation of law when the circumstances of a transaction are such that the court finds it inequitable for the legal owner to enjoy the beneficial interest." (128 Ill. App. 3d 250, 255, 470 N.E.2d 589.) A constructive trust will result when there is a breach of fiduciary relationship or when fraud is proved. *Williams v. Teachers Insurance & Annuity Association*

(1973), 15 Ill. App. 3d 542, 304 N.E.2d 656.

In the present case, plaintiff alleges in count V that the property which decedent bequeathed to the Mother Church is subject to a constructive trust because Erickson and Tanner were acting as agents of the Mother Church when they treated decedent. Plaintiff argues that the Mother Church is therefore liable for the misconduct of Erickson and Tanner under a theory of *respondeat superior*. Plaintiff in count V repeats the same allegations of misconduct set forth in her counts based on negligence and intentional/reckless disregard.

Plaintiff's attempt to impose a constructive trust must fail. First, plaintiff has failed to set forth sufficient facts showing that Erickson and Tanner were acting as agents under the supervision and control of the Mother Church. It is held that the facts upon which an agent-principal relationship is based must be specifically pleaded. (*Kutner v. DeMassa* (1981), 96 Ill. App. 3d 243, 421 N.E.2d 231.) Furthermore, even assuming the existence of an agency relationship, we have already held that plaintiff is unable to state any underlying actionable misconduct against Erickson and Tanner. As such, any action against the Mother Church based on an agency theory obviously must also fail. Consequently, the trial court correctly dismissed count V of plaintiff's fourth amended complaint.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN and CAMPBELL, JJ., concur.