2001 UT 25

Lynette Earl FRANCO, Ralph Earl, and Janice Earl, Plaintiffs and Appellants,

v.

THE CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, Dennis Casaday, David Christensen, Dennis Strong, Marian Strong, Paul Browning, Craig Berthold, and Bountiful Health Center, Defendants and Appellees.

No. 981873.

Supreme Court of Utah.

March 9, 2001.

Edward R. Montgomery, Salt Lake City, for appellants.

Paul H. Matthews, Randy T. Austin, Alexander Dushku, Amy S. Thomas, Salt Lake City, for appellees.

RUSSON, Associate Chief Justice:

¶1 Plaintiffs Lynette Earl Franco ("Franco") and her parents Ralph and Janice Earl appeal the district court's dismissal of their tort claims against defendants The Church of Jesus Christ of Latter-day Saints (the "LDS Church"), Dennis Casaday, an LDS Church ward[1] bishop,[2] and David Christensen, an LDS Church stake[3] president[4] (collectively, "the LDS Church Defendants"). Franco sued the LDS Church Defendants for injuries she allegedly suffered as a result of advice she received during ecclesiastical counseling. We affirm.

## BACKGROUND

¶2 Because this is an appeal from a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure,[5] "we review only the facts alleged in the complaint." *Educators Mut. Ins. Ass'n v. Allied Property & Cas. Ins. Co.*, 890 P.2d 1029, 1029 (Utah 1995). "In so doing, we 'accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff.'" *Id.* at 1029–30 (quoting *Prows v. State*, 822 P.2d 764, 766 (Utah 1991)); *see also Lowe v. Sorenson Research Co.*, 779 P.2d 668, 669 (Utah 1989).

¶3 Applying this standard, the complaint alleged the following operative facts: Beginning in July 1986, seven-year-old Lynette Earl Franco was sexually abused by fourteen-year-old Jason Strong ("Strong"). At the time the abuse occurred, both Franco and Strong were members of the same local ward of the LDS Church. The sexual abuse perpetrated against Franco was so extreme that she repressed the memory of the abuse until 1992, when she was fourteen years old. Upon recalling these incidents, Franco and her parents sought ecclesiastical counseling from the bishop of their local LDS Church ward, Dennis Casaday ("Casaday"), and from their LDS Church stake president, David

---

1. A "ward" is an ecclesiastical division of the LDS Church, based upon geographical area.

2. A "bishop" is the ecclesiastical leader of a ward.

3. A "stake" is an ecclesiastical division of the LDS Church that consists of several wards.

4. A "stake president" is the ecclesiastical leader of a stake.

5. In its memorandum decision, the trial court stated that it had considered evidence outside of the parties' memoranda and therefore, although entitled a motion to dismiss, the LDS Church Defendants' motion was more appropriately treated as a motion for summary judgment under rule 56(c) of the Utah Rules of Civil Procedure. However, the only outside evidence presented by the parties related solely to Franco's claim for fraud. Therefore, we treat the LDS Church Defendants' motion to dismiss Franco's fraud claim as one for summary judgment as provided for in rule 56 of the Utah Rules of Civil Procedure. *See* part IIIC *infra*. However, with regard to Franco's remaining claims, we treat the LDS Church Defendants' motion as a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure.

Christensen ("Christensen"). During these ecclesiastical counseling sessions, Casaday and Christensen advised Franco to "forgive, forget, and seek Atonement." Moreover, at some point in the process of the ecclesiastical counseling, Franco determined that she needed additional help and therefore asked Casaday and Christensen to refer her to a licensed mental health professional. In accordance with this request, Casaday and Christensen referred Franco and her parents to Dr. Paul Browning ("Browning"), allegedly stating that Browning was "well qualified to help them." Browning was employed by the Bountiful Mental Health Center, where he worked under Craig Berthold ("Berthold"), a licensed clinical social worker. On his business card, Browning held himself out as practicing "Individual, Marital, and Family Counseling," under the heading of "General Psychiatry." However, Browning was not a licensed mental health professional in the state of Utah. Upon receiving the referral from Casaday and Christensen, Browning counseled with Franco and her parents at the Bountiful Mental Health Center, advising Franco to forgive Strong and forget the incidents of sexual abuse rather than to inform the police. Finding Browning's advice unsatisfactory, Franco and her parents sought advice from another secular counselor, who then reported the incidents of sexual abuse to the police. After the incidents of sexual abuse were reported to the police, Franco alleged that she was "ostracized and denigrated" by the members of her local LDS Church ward, with the acquiescence of Casaday and Christensen, and therefore withdrew from the LDS Church.

¶ 4 Based on the above-described allegations, Franco asserted six claims against the LDS Church Defendants,[6] all in tort: (1) clerical malpractice; (2) gross negligence; (3) negligent infliction of emotional distress; (4) breach of fiduciary duty; (5) intentional infliction of emotional distress; and (6) fraud. On April 18, 1997, Franco voluntarily dismissed her case, and she refiled it on April 4, 1998, asserting the same claims.

¶ 5 The LDS Church Defendants did not file an answer to Franco's complaint but moved to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure. In their motion, the LDS Church Defendants argued that as a matter of law, Franco could not recover under any of her theories. Specifically, the LDS Church Defendants contended that a determination of Franco's claims would necessarily implicate an excessive governmental entanglement with religion because resolution of the claims would require the courts to impose a secular duty of care on pastoral counselors and therefore the claims were barred by the First Amendment to the United States Constitution. The LDS Church Defendants further contended that even if Franco's claims were not barred by the First Amendment, her fraud and emotional distress claims failed as a matter of Utah law.

¶ 6 In response, Franco argued that her tort claims did not require an inquiry into the LDS Church's religious doctrines, practices, or beliefs and therefore the First Amendment was inapplicable. Moreover, Franco argued that she had sufficiently stated claims for fraud and emotional distress under Utah law.

¶ 7 On October 13, 1998, the trial court issued a memorandum decision[7] dismissing Franco's tort claims against the LDS Church Defendants. The trial court held that each of Franco's tort claims was based on allegations that the LDS Church Defendants (1) counseled with Franco in an ecclesiastical setting and (2) recommended Browning as someone whom Franco might consult for further counseling and that, by doing so, the LDS Church Defendants departed from ac-

---

6. In addition to asserting claims against the LDS Church Defendants, Franco also asserted claims against Dennis Strong and Marian Strong, Jason Strong's parents (collectively, the "Strongs") and Browning, Berthold, and the Bountiful Mental Health Center (collectively, the "Mental Health Defendants"). However, the Strongs and the Mental Health Defendants each filed separate motions to dismiss Franco's claims against them under rule 12(b)(6) of the Utah Rules of Civil Procedure, which the trial court granted. In this appeal, Franco does not argue that the trial court erred in dismissing her claims against the Strongs or the Mental Health Defendants.

7. The trial court's memorandum decision was contained in a minute entry.

cepted practices in the services rendered. In light of these allegations, the trial court concluded that Franco's claims were essentially asking the court to impose a secular duty of care on pastoral counselors in the performance of their ecclesiastical counseling duties, which the trial court concluded was prohibited by the First Amendment to the United States Constitution. In addition, the trial court held that there were no allegations that the LDS Church Defendants "had any indication their conduct might cause bodily harm or that they engaged in conduct of such a nature as to be considered outrageous and intolerable" and therefore any claims for negligent or intentional infliction of emotional distress failed as a matter of law.

¶ 8 On December 23, 1998, Franco appealed to this court. Franco argues that the trial court erred in holding that her claims for gross negligence, negligent infliction of emotional distress, breach of fiduciary duty, intentional infliction of emotional distress, and fraud are barred by the First Amendment. Specifically, Franco argues that her tort claims do not require an inquiry into the LDS Church's practices or religious beliefs and therefore the First Amendment does not offer the LDS Church Defendants any protection from her claims. Franco does not argue on appeal, however, that the trial court erred in its determination that her claim for clerical malpractice was barred by the First Amendment.

¶ 9 In response, the LDS Church Defendants argue that the essence of Franco's claims, like her clerical malpractice claim, was that the clergymen failed to properly perform their ecclesiastical counseling duties and that based on these allegations, the trial court correctly dismissed the claims under the First Amendment. Moreover, the LDS Church Defendants argue that Franco's claims for fraud, gross negligence, and negligent and intentional infliction of emotional distress fail as a matter of Utah law.

**8.** Justice Durrant states in his concurring opinion that although he agrees with our analysis of the issues presented in this case under the Establishment Clause, he believes that the issues could also be analyzed under the Free Exercise Clause. However, as noted above, the LDS Church Defendants rely primarily on the Establishment Clause in making their constitutional argument.

## STANDARD OF REVIEW

¶ 10 Under rule 12(b)(6) of the Utah Rules of Civil Procedure, a motion to dismiss is proper "only where it clearly appears that the plaintiff or plaintiffs would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim." *Prows v. State,* 822 P.2d 764, 766 (Utah 1991) (citing *Colman v. Utah State Land Bd.,* 795 P.2d 622, 624 (Utah 1990)). Accordingly, we will affirm the trial court's dismissal " 'only if it is apparent that as a matter of law, the plaintiff could not recover under the facts alleged.' " *Educators Mut. Ins. Ass'n v. Allied Property & Cas. Ins. Co.,* 890 P.2d 1029, 1030 (Utah 1995) (quoting *Lowe v. Sorenson Research Co.,* 779 P.2d 668, 669 (Utah 1989)). "Because we consider only the legal sufficiency of the complaint, we grant the trial court's ruling no deference"; we review it for correctness. *Id.*

## ANALYSIS

### I. OVERVIEW OF FIRST AMENDMENT PRINCIPLES

¶ 11 The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibit the free exercise thereof. . . ." These two clauses are known, respectively, as the Establishment Clause and the Free Exercise Clause. In this case, the LDS Church Defendants rely primarily on the Establishment Clause in making their constitutional argument that Franco's claims are barred by the First Amendment.[8]

Specifically, the LDS Church Defendants argue, inter alia, that the First Amendment bars Franco's claims because an adjudication of the claims would foster an excessive governmental entanglement with religion. As we will discuss in greater detail *infra,* the analytical framework set forth by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105,

¶ 12 In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court explained that the Establishment Clause does not merely prohibit the establishment of a state church or a state religion, but commands "that there should be 'no law *respecting* an establishment of religion.'" *Id.* at 612, 91 S.Ct. 2105 (quoting U.S. Const. amend. I). Accordingly, laws that do not establish a religion but that are "a step that could lead to such establishment" may violate the First Amendment. *Id.* Moreover, the United States Supreme Court has broadly interpreted the command to "make no law respecting an establishment of religion" as prohibiting all forms of governmental action, including both statutory law and court action through civil lawsuits. *See Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (per curiam).

■ ¶ 13 *Lemon* and subsequent cases have relied on a three-part test to determine whether governmental activity constitutes a "law respecting an establishment of religion." Specifically, for governmental action not to be a law respecting an establishment of religion, the action (1) must have a "secular legislative purpose," (2) must "neither advance[ ] nor inhibit[ ] religion," and (3) must not foster "'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). In addressing the tort liability of clergy under the Establishment Clause, courts have focused on the "third prong" of the *Lemon* test, "excessive government entanglement." *See Dausch v. Rykse*, 52 F.3d 1425, 1432 (7th Cir.1994) (Ripple, J., concurring in part and dissenting in part, joined by Coffey, J., concurring) (applying entanglement doctrine to tort claim against clergyman); *Schmidt v. Bishop*, 779 F.Supp. 321, 328 (S.D.N.Y.1991) (same); *Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948, 960 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989) (same);

*Konkle v. Henson*, 672 N.E.2d 450, 454 (Ind. Ct.App.1996) (same); *H.R.B. v. J.L.G.*, 913 S.W.2d 92, 98–99 (Mo.Ct.App.1995) (same); *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 897 (Tex.App. 2000) (same); *L.L.N. v. Clauder*, 209 Wis.2d 674, 563 N.W.2d 434, 440 (1997) (same).

■ ¶ 14 The excessive entanglement test is, by necessity, one of degree. Indeed, separation of church and state cannot mean the absence of all governmental contact with religion, "since the complexities of modern life inevitably produce some contact." 16A Am. Jur.2d *Constitutional Law* § 422, at 405 (1998). In light of this reality, the entanglement doctrine does not bar tort claims against clergy for misconduct not within the purview of the First Amendment, because the claims are unrelated to the religious efforts of a cleric. *See, e.g., Heath v. First Baptist Church*, 341 So.2d 265 (Fla.Dist.Ct. App.), *cert. denied*, 348 So.2d 946 (Fla.1977) (holding that church may be held liable for slip and fall on the premises under negligence claim); *Fintak v. Catholic Bishop of Chicago*, 51 Ill.App.3d 191, 9 Ill.Dec. 223, 366 N.E.2d 480 (1977) (same); *Bass v. Aetna Ins. Co.*, 370 So.2d 511 (La.1979) (holding church liable for negligence of pastor who created an unreasonable risk of injury by not clearing aisles to make way for running "in the Spirit," a form of religious expression in that church).

■ ¶ 15 However, it is well settled that civil tort claims against clerics that require the courts to review and interpret church law, policies, or practices in the determination of the claims are barred by the First Amendment under the entanglement doctrine. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709–10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Dausch*, 52 F.3d at 1432; *L.L.N.*, 563 N.W.2d at 440. For, as the Supreme Court stated in *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), churches must have "power to decide for themselves, free

29 L.Ed.2d 745 (1971), places the entanglement assessment under the Establishment Clause. Therefore, because the LDS Church Defendants relied primarily on the Establishment Clause in

making their constitutional argument, and because the Establishment Clause is dispositive of the issues before us, we do not address the Free Exercise Clause in this case.

from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116, 73 S.Ct. 143.

## II. CLAIMS FOR CLERGY MALPRACTICE

¶ 16 In light of the First Amendment principles discussed above, the question of whether courts can adjudicate a claim for clergy malpractice has become a frequently litigated issue in recent years. *See, e.g., Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948, 960 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Destefano v. Grabrian*, 763 P.2d 275, 285 (Colo.1988); *Hester v. Barnett*, 723 S.W.2d 544, 550 (Mo.Ct.App.1987); *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584, 586 (1991). Moreover, "[t]he issue has generated a growing body of scholarly commentary." *Schmidt v. Bishop*, 779 F.Supp. 321, 327 (S.D.N.Y.1991) (citing Samuel E. Ericsson, *Clergyman Malpractice: Ramifications of a New Theory*, 16 Val. U.L.Rev. 163 (1981); Michael J. Florillo, Comment, *Clergy Malpractice: Should Pennsylvania Recognize a Cause of Action for Improper Counseling by a Clergyman?*, 192 Dick. L.Rev. 223 (1987); G. Grace McCaffrey, Note, *Nally v. Grace Community Church of the Valley: Clergy Malpractice—A Threat to Both Liberty and Life*, 11 Pace L.Rev. 137 (1990)).

¶ 17 However, despite the apparent controversy, courts throughout the United States have uniformly rejected claims for clergy malpractice under the First Amendment. *See Dausch v. Rykse*, 52 F.3d 1425, 1432 (7th Cir.1994) (Ripple, J., concurring in part and dissenting in part, joined by Coffey, J., concurring) ("Indeed, a cause of action for clergy malpractice has been rejected uniformly by the states that have considered it."). These courts have generally held that a determination of such claims would necessarily entangle the courts in the examination of religious doctrine, practice, or church polity—an inquiry that we have already explained is prohibited by the Establishment Clause. *See, e.g., Destefano*, 763 P.2d at 285; *Amato v. Greenquist*, 287 Ill.App.3d 921, 223 Ill.Dec. 261, 679 N.E.2d 446, 453 (1997); *Baumgartner v.*

*First Church of Christ, Scientist*, 141 Ill. App.3d 898, 96 Ill.Dec. 114, 490 N.E.2d 1319, 1324, *cert. denied*, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986); *Schieffer v. Catholic Archdiocese*, 244 Neb. 715, 508 N.W.2d 907, 912 (1993).

¶ 18 For example, in *Nally*, like the case at hand, parishioners sued a clergyman for allegedly mishandling the pastoral counseling relationship. Specifically, the plaintiffs alleged that the clergyman was negligent in failing to warn them of the mental state of their son, whom the clergyman had counseled, but who ultimately committed suicide. *Nally*, 253 Cal.Rptr. 97, 763 P.2d at 952. In resolving the case, the California Supreme Court considered and rejected the clergy malpractice theory of liability, stating:

> Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors. *Such a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity.*

*Id.*, 253 Cal.Rptr. 97, 763 P.2d at 960 (emphasis added).

¶ 19 Similarly, in *White v. Blackburn*, 787 P.2d 1315 (Utah Ct.App.1990), under strikingly similar facts to the case at hand, the Utah Court of Appeals also considered and rejected the clergy malpractice theory of liability. *See id.* at 1318–19. In *White*, parents asserted a claim for malpractice against a clergyman, not for negligently *referring* a parishioner to outside counseling-the factual allegations in the case at hand, but for negligently *failing* to refer their son "to trained professionals." *Id.* at 1318. In dismissing the clergy malpractice claim, the court of appeals stated:

> [A]ppellant wishes to impose a duty upon [clergy] to make further inquiry into the alleged family conflicts, and then, if beyond [their] expertise, refer [parishioners] to others who are qualified to treat such problems. Under the present circumstances, charging lay clergy with this duty of care goes too far because it approaches

the same level of care imposed upon trained professionals in medicine and psychology.

. . .

"Even assuming that workable standards of care could be established in the present case, . . . [s]uch a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity."

*Id.* at 1318–19 (quoting *Nally,* 253 Cal.Rptr. 97, 763 P.2d at 960). We find the reasoning of the *Nally* and *White* courts to be sound.

### III. FRANCO'S CLAIMS

#### A. Negligence–Based Claims

¶ 20 Franco's complaint pleads claims against the LDS Church Defendants for gross negligence, negligent infliction of emotional distress, and breach of fiduciary duty ("negligence-based claims"). Franco argues that these claims are different from a clergy malpractice claim in substance and effect and therefore the First Amendment is inapplicable. The LDS Church Defendants argue, however, that despite Franco's "creative pleading," her claims are merely a roundabout way of alleging clergy malpractice and therefore the claims are barred by the First Amendment.

¶ 21 As an initial matter, we must emphasize that regardless of whether a claim against a cleric is one for malpractice, the claim will not survive constitutional scrutiny if an adjudication of the claim would foster an excessive governmental entanglement with religion in violation of the Establishment Clause. However, that said, we agree with the LDS Church Defendants that Franco's negligence-based claims are merely an elliptical way of alleging clergy malpractice.

¶ 22 An examination of Franco's complaint reveals that each of her negligence-based claims alleges that while counseling with Franco in the context of an ecclesiastical counseling relationship, the LDS Church Defendants breached a duty owed to Franco by advising her to "forgive, forget, and seek Atonement" or by advising her to seek outside help from Browning, an unlicensed

therapist. Accordingly, like her clergy malpractice claim, which she abandoned on appeal, the essence of each of Franco's negligence-based claims is that the LDS Church Defendants generally mishandled the pastoral counseling relationship by giving bad advice—claims necessarily directed at the LDS Church Defendants' performance of their ecclesiastical counseling duties. Therefore, despite Franco's characterization of her negligence-based claims as gross negligence, negligent infliction of emotional distress, and breach of fiduciary duty, we must deal with the real issue here—clergy malpractice. *See Dausch v. Rykse,* 52 F.3d 1425, 1438 (7th Cir.1994) (Ripple, J., concurring in part and dissenting in part, joined by Coffey, J., concurring) (stating that district court correctly determined that plaintiff's claim for breach of fiduciary duty was "simply an elliptical way of alleging clergy malpractice"); *Schmidt v. Bishop,* 779 F.Supp. 321, 327 (S.D.N.Y.1991) ("[A]s with her negligence claim, [plaintiff's] fiduciary duty claim is merely another way of alleging that the [clergyman] grossly abused his pastoral role, that is, that he engaged in *malpractice.*"); *Amato v. Greenquist,* 287 Ill.App.3d 921, 223 Ill.Dec. 261, 679 N.E.2d 446, 451 (1997) (stating that "we will not determine the justiciability of [plaintiff's] counts based upon the nomenclature used by the plaintiff in entitling the counts" in determining whether a negligence claim against a cleric is essentially a malpractice claim).

¶ 23 Because Franco's negligence-based claims allege that the LDS Church Defendants generally mishandled their ecclesiastical counseling duties, a determination of the claims, like the clergy malpractice claims asserted in *Nally* and *White,* could not be made without first ascertaining whether the LDS Church Defendants performed within the level of expertise expected of a similar professional, i.e., a reasonably prudent bishop, priest, rabbi, minister, or other cleric in this state. Indeed, malpractice is a theory of tort that would involve the courts in a determination of whether the cleric in a particular case—here an LDS Church bishop—breached the duty to act with that degree of "skill and knowledge normally possessed by mem-

bers of that profession." Restatement (Second) of Torts § 299A (1965). Defining such a duty would necessarily require a court to express the standard of care to be followed by other reasonable clerics in the performance of their ecclesiastical counseling duties, which, by its very nature, would embroil the courts in establishing the training, skill, and standards applicable for members of the clergy in this state in a diversity of religions professing widely varying beliefs. This is as impossible as it is unconstitutional; to do so would foster an excessive government entanglement with religion in violation of the Establishment Clause. *See, e.g., Dausch v. Rykse,* 52 F.3d at 1432 (Ripple, Circuit J., concurring in part and dissenting in part) (stating that an evaluation of a clergy malpractice claim would require courts to evaluate and investigate religious tenets and doctrines); *Hester v. Barnett,* 723 S.W.2d 544, 553 (Mo.Ct.App.1987) (stating that clergy malpractice would force courts to judge "competence, training, methods and content of the pastoral function"); *F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697, 706 (1997) (O'Hern, J., dissenting) (stating that creating a tort of clergy malpractice would "establish an official religion of the state"); *Bladen v. First Presbyterian Church of Sallisaw,* 857 P.2d 789, 797 (Okla.1993) ("Once a court enters the realm of trying to define the nature of advice a minister should give a parishioner serious First Amendment issues are implicated.").

¶ 24 Accordingly, we conclude that the trial court correctly determined that Franco's claims against the LDS Church Defendants for gross negligence, negligent infliction of emotional distress, and breach of fiduciary duty are barred by the First Amendment to the United States Constitution.

### B. Intentional Infliction of Emotional Distress

¶ 25 In addition to her negligence-based claims, Franco also asserted a claim against the LDS Church Defendants for intentional infliction of emotional distress. In *Samms v. Eccles,* 11 Utah 2d 289, 358 P.2d 344 (1961), this court stated:

Due to the highly subjective and volatile nature of emotional distress and the variability of its causations, the courts have historically been wary of dangers in opening the door to recovery therefor. This is partly because such claims may easily be fabricated: or as sometimes stated, are easy to assert and hard to defend against. *Samms,* 11 Utah 2d at 291, 358 P.2d at 345. Accordingly, to state a claim for intentional infliction of emotional distress, a plaintiff must allege that the defendant

"intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality."

*Jackson v. Brown,* 904 P.2d 685, 687–88 (Utah 1995) (emphasis added) (quoting *Samms,* 11 Utah 2d at 293, 358 P.2d at 347).

¶ 26 The sufficiency of Franco's pleadings "must be determined by the facts pleaded rather than the conclusions stated." *Ellefsen v. Roberts,* 526 P.2d 912, 915 (Utah 1974). In light of this standard, Franco's claim under this cause of action pleads the following operative facts: that during ecclesiastical counseling, Franco asked the LDS Church Defendants to refer her to a licensed mental health professional; that in accordance with her request, the LDS Church Defendants referred Franco to Browning at the Bountiful Mental Health Center, allegedly stating that he was "well qualified to help"; and that despite this representation, Browning was not qualified to render the appropriate treatment. Franco alleges that the LDS Church Defendants referred her to Browning for the "purpose" of protecting Strong and the LDS Church and that these actions were made "in a reckless and intentional manner that was extreme and outrageous" and caused her severe emotional distress.

¶ 27 However, despite the above, Franco's complaint is devoid of allegations that the LDS Church Defendants referred her to Browning for the *purpose* of inflicting emotional distress. Rather, Franco merely alleg-

es that the LDS Church Defendants referred her to Browning, not for the purpose of inflicting emotional distress, but to protect Strong and the LDS Church and that as a result of this conduct, she suffered severe emotional distress. This bare allegation, however, even assuming its truth, is insufficient to state a claim under the "purpose" test established by *Samms*. *See Samms*, 11 Utah 2d at 293, 358 P.2d at 347; *see also* 86 C.J.S. *Torts* § 72, at 728 (1997) (stating that "[i]t is not enough to establish a claim that defendant intentionally acted in a way that *causes* distress" (emphasis added)).

¶ 28 Moreover, Franco's complaint alleges no action by the LDS Church Defendants that can be "considered outrageous and intolerable in that [it] offend[s] against the generally accepted standards of decency and morality." *Samms*, 11 Utah 2d at 293, 358 P.2d at 347. To be considered outrageous, "[t]he conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." 86 C.J.S., *supra* ¶ 27, § 70, at 722. Furthermore, "[a]n act is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." *Id.* at 722–23; *see also* Restatement (Second) of Torts § 46 cmt. d (1965).

¶ 29 In this case, at worst, the LDS Church Defendants' actions consisted of referring Franco to an unlicensed counselor. However, the complaint contains no allegations that the LDS Church Defendants knew Browning was unlicensed when they made the referral or that the LDS Church Defendants had any other indication their conduct in referring Franco to Browning might cause emotional distress. Absent such evidence or allegations, the LDS Church Defendants' actions cannot be considered outrageous and intolerable as a matter of law. To hold otherwise would leave every bishop, priest, rabbi, or minister of every church who seeks to help a parishioner having apparent psychiatric problems to receive outside secular counseling open to liability for intentional infliction of emotional distress.

¶ 30 Based on the above, we hold that the trial court did not err in dismissing Franco's claim against the LDS Church Defendants for intentional infliction of emotional distress. Because we have determined that this claim fails as a matter of law, we do not reach the constitutional issue. *See Hoyle v. Monson*, 606 P.2d 240, 242 (Utah 1980) (stating that it is a "fundamental rule" that constitutional questions should not be reached if the merits of the case can be determined on other than constitutional grounds).

### C. Fraud

¶ 31 Finally, we address Franco's claim against the LDS Church Defendants for fraud. As an initial matter, as noted in footnote 5 *supra*, matters outside the pleadings have been presented with regard to Franco's fraud claim that were not excluded by the trial court, and therefore, we treat the LDS Church Defendants' motion to dismiss this claim as one for summary judgment as provided for in rule 56 of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 12(b); *Lind v. Lynch*, 665 P.2d 1276, 1278 (Utah 1983).

¶ 32 A grant of summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). On appeal from a summary judgment, "we accept the facts and inferences in the light most favorable to the losing party." *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). Because we resolve only legal issues in reviewing a summary judgment, "we give no deference to the trial court's view of the law; we review it for correctness." *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989).

¶ 33 To establish fraud under Utah law, a party must prove by clear and convincing evidence each of the following elements: "(1) That a representation was made; (2) concerning a presently existing material fact; (3) *which was false;* (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6)

that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage." *Mikkelson v. Quail Valley Realty,* 641 P.2d 124, 126 (Utah 1982) (emphasis added) (quoting *Pace v. Parrish,* 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952)).

¶ 34 In this case, in support of her fraud claim, Franco argues that the LDS Church Defendants "falsely" represented to her that Browning "had a Ph.D. in counseling or psychology *or* was a licensed psychiatrist." (Emphasis added.) However, in a letter from the Bountiful Mental Health Center to Franco, which *Franco* presented to the trial court as an exhibit, Craig Berthold, the director of the Bountiful Mental Health Center, stated: "Dr. Browning does have a doctorate degree in Counseling (Ph.D.), from the educational psychology department at the University of California at Los Angeles." Accordingly, Franco's own exhibit establishes that the LDS Church Defendants did not make a representation concerning a presently existing material fact "which was false," *Pace,* 122 Utah at 145, 247 P.2d at 275, and therefore, the LDS Church Defendants are entitled to a judgment as a matter of law on this count.

¶ 35 Moreover, even if we were to ignore the evidence that Browning had a Ph.D. in counseling or psychology, focusing solely on Franco's argument in this appeal that the LDS Church Defendants' false representation was that Browning was licensed, as Franco argues we should, her claim still fails as a matter of law because the complaint does not plead fraud with sufficient particularity to withstand summary judgment.

¶ 36 To state a claim for fraud, a plaintiff must plead not only that the defendant made a material representation that was false, but also that the defendant either *knew* the representation to be false or made the representation recklessly, *knowing* that he or she had insufficient knowledge upon which to base such a representation. *See Mikkelson,* 641 P.2d at 126; *see also* 37 Am.Jur.2d *Fraud and Deceit* § 41, at 66 (1968) (stating that one of the "necessary elements" upon which to base an action in

fraud is that a false representation was made "and known to be false by the party making it"). Moreover, because this is a claim for fraud, "the circumstances constituting fraud or mistake [must] be stated with particularity." Utah R. Civ. P. 9(b). "We have stressed, and continue to hold, that mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient to preclude ... summary judgment." *Chapman v. Primary Children's Hosp.,* 784 P.2d 1181, 1186 (Utah 1989) (citing *Norton v. Blackham,* 669 P.2d 857, 859 (Utah 1983); *Ellefsen v. Roberts,* 526 P.2d 912, 915 (Utah 1974)).

¶ 37 In this case, as we stated with regard to Franco's claim for intentional infliction of emotional distress, the complaint is devoid of allegations that the LDS Church Defendants represented to Franco that Browning was licensed, *knowing* that he was unlicensed, or *knowing* that they had insufficient knowledge upon which to base such a representation. Moreover, as part of her general allegations, Franco stated that the Bountiful Mental Health Center "held ... Browning out to [be] licensed or qualified to render the appropriate treatment" and that Browning held himself out on his business card as practicing "Individual, Marital, and Family Counseling," under the heading of "General Psychiatry." Therefore, even though we must consider all reasonable inferences to be drawn from the facts in a light most favorable to the plaintiff, the only reasonable inference that can be drawn from the facts alleged in this case, is that the LDS Church Defendants believed that Browning was licensed to provide the appropriate treatment when they made the referral.

¶ 38 Accordingly, because Franco has failed to establish the necessary elements of fraud, the LDS Church Defendants are entitled to a judgment as a matter of law on this count, and consequently, we do not address the constitutional issue.

## CONCLUSION

¶ 39 We hold that the trial court correctly determined that Franco's claims against the LDS Church Defendants for gross negli-

gence, negligent infliction of emotional distress, and breach of fiduciary duty are barred by the First Amendment to the United States Constitution. We further hold that Franco's claims for intentional infliction of emotional distress and fraud fail as a matter of law. Accordingly, we affirm the trial court's dismissal of Franco's tort claims against the LDS Church Defendants.

¶ 40 HOWE C.J., and DURHAM, J., concur in RUSSON's, A.C.J., opinion.

DURRANT, Justice, concurring:

¶ 41 I concur. The court's analysis is consistent with *Lemon* and its progeny. To permit a plaintiff to enlist the judicial system to press a claim for clergy malpractice would clearly result in the kind of governmental intrusion into religious practices that is prohibited by the entanglement prong of current Establishment Clause analysis. Further, in focusing exclusively on the Establishment Clause in its analysis, our opinion adopts the analytical approach commonly used by courts in assessing clergy malpractice claims. I write separately merely to note that I believe the plaintiff's claims are barred not only by the Establishment Clause, but by the Free Exercise Clause as well.[1]

¶ 42 In my view, judicial analyses of religious issues under the First Amendment have too often come to focus exclusively on the Establishment Clause. I think this unfortunate because a significant part of the genius of the two religion clauses is in their mutually reinforcing dynamic. One of the central means of promoting the free exercise of religious beliefs protected by the Free Exercise Clause is to guard against the establishment of a state church, as proscribed by the Establishment Clause. One of the central means of guarding against the establishment of a particular religion is to protect the free exercise rights of adherents of all religions. While the clauses are complementary in this sense, in another sense they are in dynamic tension. To allow a particular state benefit to a religious group may implicate the Establishment Clause, yet to deny it

to that group may impinge upon free exercise rights. Yet, notwithstanding their at once complementary and contradictory nature, I believe that the ultimate end of both religion causes is the same—the protection of religious liberty.

¶ 43 However, as courts have expanded the reach of the Establishment Clause to include the prohibitions of state benefits to, or accommodations of, religion that in no realistic sense could lead to the establishment of a state church, they have tended to diminish the protections of the Free Exercise Clause. Or, they have made the Establishment Clause do the work of the Free Exercise Clause. For instance, the entanglement prong of the *Lemon* Establishment Clause analysis may actually be a better analytical fit with the Free Exercise Clause. The case before us illustrates this point. Under traditional Establishment Clause analysis, allowing clergy malpractice claims would clearly result in an excessive governmental entanglement with religion. The courts would be put in the position of overseeing, assessing, and passing judgment on a core activity of churches—the provision of ecclesiastical counseling. Clearly, this would be an unconstitutional governmental intrusion into religion. But on what basis is it unconstitutional? Is permitting this type of entanglement a step that is likely to lead to the establishment of religion? Does its constitutional infirmity lie in the fact that it benefits religion? I think that few religious denominations would view governmental intrusion into their core ecclesiastical functions as somehow benefitting them. The danger of such an intrusion is not so much that it could lead to the establishment of religion as that it directly impinges on the free exercise of religion. Yet, under the *Lemon* analytical framework, which places the entanglement assessment under the Establishment Clause, we are led to the Establishment Clause analysis upon which the court's opinion relies.

¶ 44 It might be asked what difference it makes whether a governmental intrusion into religion is analyzed under the Establishment

---

1. The LDS Church's brief on appeal presents arguments under the excessive entanglement prong of the Establishment Clause and under what it describes as the " 'church autonomy doctrine' ... [g]rounded in both religion clauses of the First Amendment."

Clause or the Free Exercise Clause. In either case, the intrusion is proscribed. I think it matters because to the extent we blur the analytical distinction between the Establishment and Free Exercise Clauses, to the extent we make the Establishment Clause do the work of both clauses, we sap some of the life from the Free Exercise Clause. Further, we lose the benefits that come from examining the clauses in tandem. I think we would be better served if, in the development of our religion clauses' jurisprudence, courts more often examined the full picture and conducted their analysis with reference to both clauses, taking into account both their mutually reinforcing aspects as well as the distinct rights they protect.

¶ 45 Accordingly, while I concur in the court's opinion, I would also affirm on the ground that the claims determined by the court to be barred by the Establishment Clause are also barred by the Free Exercise Clause. Recognizing a cause of action that is in essence one for clergy malpractice would amount to a secular judicial restraint upon one of the core functions of many religious denominations. Indeed, given the fact that actions for malpractice in other contexts have developed within fields of employment reserved for professionals whose practices are heavily regulated, a common law action for clergy malpractice would necessarily borrow its criteria from those contexts. The consequence would be tantamount to regulatory oversight by the judiciary of ecclesiastical counseling. Neither the Free Exercise Clause nor the Establishment Clause permits such a result.

¶ 46 WILKINS, J., concurs in DURRANT's, J., concurring opinion.