OPINION
¶ 1 Plaintiff Michael Charles Gulbraa appeals the district court's order dismissing his first amended complaint against Defendants Corporation of the President of the Church of Jesus Christ of Latter-day Saints and the Office of the Presiding Bishopric of the Church of Jesus Christ of Latter-day Saints (collectively, the Church Defendants) for failure to state a claim upon which relief can be granted. We affirm in part and reverse and remand in part.
 BACKGROUND[1] ¶ 2 Plaintiff is the natural father and custodial parent of two sons (the Children). In March 2002, Plaintiff was awarded sole custody of the Children in a divorce proceeding. However, Plaintiff's ex-wife, the Children's natural mother, and her current husband took the Children to Japan in violation of court orders. Plaintiff sought the help of several government agencies, including the Federal Bureau of Investigation (FBI), to locate and bring the Children back to Utah, resulting in federal kidnapping charges being brought against Plaintiff's ex-wife and her current husband.
 ¶ 3 Upon learning that the Children were living in Japan, Plaintiff, an active member of the Church of Jesus Christ of Latter-day Saints (the Church), contacted various church leaders in Utah and Japan regarding the Children and informed them of the court orders granting him custody. As Plaintiff's oldest son was approaching the age of twelve, the age at which specific priesthood ordinances take place in the Church, Plaintiff specifically asked church leaders to ensure that no priesthood ordinances take place on behalf of the Children without giving Plaintiff prior notice and without obtaining Plaintiff's consent. Plaintiff desired to participate in his eldest son's first priesthood ordinance. Plaintiff directly communicated this information to church representatives and church general authorities located in both Utah and Japan. According to the Church's Handbook of Instructions regarding the ordination of minor children, church leaders must obtain consent of the custodial parent.
 ¶ 4 In August 2002, and again in November 2002, church leaders allegedly assured Plaintiff that no priesthood ordinations would take place without Plaintiff's knowledge, consent, and participation. Specifically, Elder Yoshihiko Kikuchi, a general authority for the Church, emailed Plaintiff and told him that he had informed local church leaders in Japan to refrain from performing any ordinations without first consulting Plaintiff and obtaining his consent. Elder Kikuchi told Plaintiff that he informed the Children's local church leaders that "[b]efore they do anything, they should consult with [Plaintiff]." Plaintiff further instructed church leaders that he specifically did not want his ex-wife's current husband performing any religious ordinations on the Children.
 ¶ 5 Plaintiff had frequent and direct contact with church leaders regarding his desire to participate in the priesthood ordinations of the Children and had received direct promises that no ordinations would take place without his knowledge, consent, and participation. However, on December 23, 2003, Plaintiff received an email from Elder Kikuchi *Page 394 
admitting that the Children had been ordained to the priesthood.
 ¶ 6 Following this email, church leaders communicated to Plaintiff that they had decided to proceed with the ordinances for the Children's benefit. They further told Plaintiff that the Children's participation in the Church is a private matter between the individual child and the Church. They then refused to discuss or disclose to Plaintiff any information about the Children's activities or status in the Church.
 ¶ 7 Plaintiff was also told by another church leader that church leaders in Japan had been instructed not to share any information about the Children with Plaintiff because the Church was afraid that Plaintiff would use that information to come and get the Children. Since then, Plaintiff has made numerous attempts to contact church leaders in Japan, but they have ignored his efforts and have refused to provide any further information to Plaintiff regarding the Children and the Children's activities in the Church. Further, local church leaders in Japan have instructed members of the Children's ward congregation in Japan to refrain from discussing the Children's church activities with Plaintiff.
 ¶ 8 Plaintiff brought suit against the Church Defendants on June 23, 2005, requesting injunctive relief and alleging breach of contract, breach of implied contract, promissory estoppel, fraud, negligent misrepresentation, and intentional infliction of emotional distress. The district court dismissed Plaintiff's first amended complaint pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. See Utah R. Civ. P. 12(b)(6). Plaintiff appeals.
ISSUE AND STANDARD OF REVIEW
 ¶ 9 On appeal, Plaintiff argues that the district court erred when it determined that all of Plaintiff's claims directly involve religious teachings and practices and are therefore barred by the entanglement doctrine of the First Amendment's Establishment Clause. "We review the district court's grant of a motion to dismiss for correctness." Hunter v. SunriseTitle Co., 2004 UT 1, ¶ 6, 84 P.3d 1163. Dismissal under rule 12(b)(6) is proper "where it clearly appears that the plaintiff or plaintiffs would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim." Prows v. State,822 P.2d 764, 766 (Utah 1991).
 ANALYSIS ¶ 10 The First Amendment of the United States Constitution prohibits congress from making any law "respecting an establishment of religion." U.S. Const. amend. I. This clause is "known . . . as the Establishment Clause." Franco v.Church of Jesus Christ of Latter-day Saints, 2001 UT 25, ¶ 11, 21 P.3d 198. In Franco v. Church of JesusChrist of Latter-day Saints, the Utah Supreme Court reviewed First Amendment principles and addressed whether certain tort causes of action against clergy violate the Establishment Clause. See id. at ¶¶ 11-19 (addressing claims for clergy malpractice).
 ¶ 11 The Utah Supreme Court explained that "the United States Supreme Court has broadly interpreted the [Establishment Clause] . . . as prohibiting all forms of governmental action [concerning religion], including . . . court action through civil lawsuits." Id. at ¶ 12; see alsoKreshik v. St. Nicholas Cathedral, 363 U.S. 190, 191,80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (per curiam). In determining whether governmental action violates the Establishment Clause, the Court has set forth a three-part test. See Franco,2001 UT 25 at ¶ 13, 21 P.3d 198; see also Lemon v.Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105,29 L.Ed.2d 745 (1971). "[F]or governmental action not to be a law respecting an establishment of religion, the action (1) must have a `secular legislative purpose,' (2) must `neither advance nor inhibit religion,' and (3) must not foster `an excessive government entanglement with religion.'"Franco, 2001 UT 25 at ¶ 13, 21 P.3d 198 (second and third alterations in original) (quoting Lemon,403 U.S. at 612-13, 91 S.Ct. 2105). The Utah Supreme Court focused on the third prong" — excessive government entanglement" — in addressing a clergy member's tort liability.Id. *Page 395 
 ¶ 12 Whether civil tort claims against a church violate the entanglement doctrine depends on the extent of the "governmental contact with religion." Id.
at ¶ 14. "[I]t is well settled that civil tort claims against clerics that require the courts to review and interpret church law, policies, or practices in the determination of the claims are barred by the First Amendment under the entanglement doctrine." Id. at ¶ 15.
 ¶ 13 This court expressed a similar principle in Whitev. Blackburn, 787 P.2d 1315, 1319 (Utah Ct.App. 1990). In that case, we declined to "establish a cause of action for clerical malpractice" because such a cause of action would create a duty of care for clergy and "`would necessarily . . . intertwine [that duty] with the religious philosophy of [a] particular denomination or ecclesiastical teachings of the religious entity'" with the courts. Id. (quotingNally v. Grace Cmty. Church of the Valley,47 Cal.3d 278, 253 Cal.Rptr.97, 763 P.2d 948, 960 (1988)).
 ¶ 14 We acknowledge that while both Franco andWhite address tort claims for clerical malpractice, this case addresses other tort claims against a religious entity. Still, we find any distinction between the claims, in terms of entanglement doctrine principles, to be insignificant. The essential allegations in this case involve promises that the Church made to Plaintiff regarding his consent and participation in the Children's priesthood ordinances.
 ¶ 15 This court has previously addressed promises and alleged misrepresentations made by a church in Hancock v.True Living Church of Jesus Christ of Saints of the LastDays, 2005 UT App 314, ¶ 17 n. 2, 118 P.3d 297. InHancock, a church promised the plaintiff that if she gave money to the church, the church would provide her with property and support, as well as certain religious benefits, including a face-to-face meeting with Jesus Christ. Seeid. at ¶ 13. This court determined that the plaintiff's claims regarding "promises of future earthly benefits," id. at ¶ 16, were "supported by allegations of secular activity potentially amounting to violations of generally applicable civil law," id.
at ¶ 17. It further noted that the allegations of a face-to-face meeting with Jesus Christ conflicted withFirst Amendment principles because that allegation was "an entirely religious matter beyond the courts' ability to adjudicate."Id. at ¶ 17 n. 2.
 ¶ 16 Plaintiff argues that the district court erred in dismissing his first amended complaint in its entirety as barred by the First Amendment under the entanglement doctrine. Thus, the central inquiry involved is whether the causes of action alleged expressly implicate religious teachings, doctrines, and practices. For, as both the Utah Supreme Court and the United States Supreme Court have noted, "churches must have `power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" Franco v. Church of Jesus Christ ofLatterday Saints, 2001 UT 25, ¶ 15, 21 P.3d 198 (quotingKedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116,73 S.Ct. 143, 97 L.Ed. 120 (1952)).
 ¶ 17 Essentially, Plaintiff asserts that his claims do not challenge the doctrines or teachings of the Church, but instead involve his right as the custodial parent to determine the children's religious affiliation and upbringing.[2] We disagree.
 ¶ 18 The allegation central to all but one of Plaintiff's claims is that the Church performed specific priesthood ordinances on the Children without his knowledge, consent, and participation. Tort claims based on this allegation implicate key religious questions, including the nature of the priesthood ordinances, the eligibility of persons to perform those ordinances, and the eligibility of persons to be ordained. Specifically, Plaintiff's claims would require the court to assess Plaintiff's religious worthiness to participate *Page 396 
in the Children's priesthood ordinances, decide whether or how the Children could participate in the Church's worship services, and decide whether or how the Children could participate in the Church as part of the Church's lay priesthood. Moreover, if Plaintiff were successful on his claims, the court would be forced to assess damages by placing a monetary value on participation in religious experiences. These allegations are entirely religious and "beyond the courts' ability to adjudicate." Hancock,2005 UT App 314 at ¶ 17 n. 2, 118 P.3d 297.
 ¶ 19 Therefore, because the implications of most of Plaintiff's claims would unconstitutionally "inject [the court] into substantive ecclesiastical matters," PresbyterianChurch v. Mary Elizabeth Blue Hull Mem'l PresbyterianChurch, 393 U.S. 440, 451, 89 S.Ct. 601, 21 L.Ed.2d 658
(1969), we conclude that the district court did not err in dismissing most of the claims alleged in Plaintiff's first amended complaint, including the claims for breach of contract, breach of implied contract, promissory estoppel, fraud, and negligent misrepresentation, and his request for injunctive relief.
 ¶ 20 However, Plaintiff's claim for intentional infliction of emotional distress would not necessarily implicate the Church's religious doctrines. Plaintiff's first amended complaint alleges that a local church leader in Japan told Plaintiff that "the local [c]hurch leaders [in Japan] had been instructed not to share any information about the [C]hildren with . . . Plaintiff, because they were afraid that Plaintiff would use th[at] information to come get the [C]hildren." The first amended complaint further states that "[c]hurch leaders have . . . conspired with federal fugitives, wanted on kidnapping charges, to conceal the . . . [C]hildren and to interfere with Plaintiff's custodial and parental rights." Plaintiff asserts that the Church Defendants' conduct in "concealing the [C]hildren [from Plaintiff,] making decisions regarding [the C]hildren and their religious upbringing, . . . and knowingly making false representations to . . . Plaintiff regarding [the Children's [c]hurch activities . . . constitutes extreme and outrageous conduct" sufficient to support a claim for intentional infliction of emotional distress.
 ¶ 21 To sustain a claim for infliction of emotional distress, Plaintiff must allege that the Church Defendants acted
 (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.
Samms v. Eccles, 11 Utah 2d 289, 358 P.2d 344, 347
(1961). Moreover, Plaintiff's distress must be "severe,'" such that "`no reasonable person could be expected to endure it.'" Schuurman v. Shingleton, 2001 UT 52, ¶ 23,26 P.3d 227 (alteration omitted) (quoting Restatement (Second) of Torts § 46 cmt.j (1948)).
 ¶ 22 Plaintiff's claim for intentional infliction of emotional distress would not necessarily unconstitutionally "inject [the court] into substantive ecclesiastical matters,"Presbyterian Church, 393 U.S. at 451, 89 S.Ct. 601. As part of his claim for intentional infliction of emotional distress, Plaintiff asserts that the Church instructed church leaders to conceal the location of the Children from Plaintiff. Such conduct is not "an entirely religious matter beyond the courts' ability to adjudicate," Hancock v. True Living Church of Jesus Christ of Saints of the Last Days,2005 UT App 314, ¶ 17 n. 2, 118 P.3d 297, but is instead "secular activity potentially amounting to a violation of generally applicable civil law," id. at ¶ 17. Thus, Plaintiff's claim for intentional infliction of emotional distress is not entirely barred under the entanglement doctrine. See Franco v. Church of Jesus Christ ofLatter-day Saints, 2001 UT 25, ¶¶ 14-15, 21 P.3d 198.
 ¶ 23 The Church Defendants assert that the Church's conduct cannot be considered outrageous, sufficient to support Plaintiff's claim for intentional infliction of emotional distress. However, whether this conduct was "outrageous and intolerable," Samms, 358 P.2d at 347, is a question of fact to be determined by the fact finder. Likewise, whether Plaintiff's distress was "`severe,'" Schuurman,2001 UT 52 at ¶ 23, 26 P.3d 227 *Page 397 
(citation omitted), is also a question for the fact finder. The district court granted the Church Defendants' motion to dismiss, not allowing factual development of Plaintiff's claim. Consequently, we cannot determine whether the Church's conduct was outrageous or whether Plaintiff's resulting distress was severe.
 ¶ 24 Therefore, we conclude that the district court erred when it dismissed Plaintiff's claim for intentional infliction of emotional distress, but only as it relates to the Church's conduct instructing Church leaders to conceal the location of the Children from Plaintiff.[3]
 CONCLUSION ¶ 25 All but one of Plaintiff's asserted causes of action would excessively entangle the court in either the Church's religious operations, the interpretation of its teachings, the performance of its ceremonies, or the governance of its affairs, thus effectively subjecting the Church to judicial oversight in violation of the Establishment Clause of the United States Constitution. Therefore, we conclude that the district court did not err in dismissing Plaintiff's claims for breach of contract, breach of implied contract, promissory estoppel, fraud, and negligent misrepresentation, and his request for injunctive relief. However, we also conclude that because certain aspects of Plaintiff's claim for intentional infliction of emotional distress do not implicate church doctrine, the trial court erred in dismissing that claim as it relates to the allegations that church leaders affirmatively acted to conceal the Children from Plaintiff.
 ¶ 26 Accordingly, we affirm in part and reverse and remand in part.
 ¶ 27 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge and WILLIAM A. THORNE JR., Judge.
[1] "When determining whether a trial court properly granted a motion to dismiss, we accept the factual allegations in the complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. We recite the facts accordingly."Krouse v. Bower 2001 UT 28, ¶ 2, 20 P.3d 895
(citation omitted).
[2] Plaintiff relies on Wisconsin v. Yoder,406 U.S. 205, 213-14, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), to support his assertion that parents have a federally protected right to determine the religious upbringing of their children. However, Plaintiff's reliance is misplaced. Yoder
involves state action, see id., and here, the Church Defendants are not state actors. Moreover, Plaintiff does not allege a statutory or common law claim against a private party for violation of parental rights.
[3] We note that our decision here does not mean that Plaintiff's claim for intentional infliction of emotional distress would not be subject to summary judgment disposition. It simply requires the discovery process to proceed and allows Plaintiff an opportunity to further develop his case.