2011 UT App 19

**Lori S. ALLEN, Petitioner and Appellee,**

v.

**Lisa K. ANGER, Respondent and Appellant.**

**No. 20100016–CA.**

Court of Appeals of Utah.

Jan. 21, 2011.

Randy S. Ludlow, Salt Lake City, for Appellant.

Kristin B. Gerdy and Ron D. Wilkinson, Orem, for Appellee.

Before Judges McHUGH, THORNE, and CHRISTIANSEN.

## OPINION

THORNE, Judge:

¶ 1 Lisa K. Anger appeals from the district court's order entering a civil stalking injunction against her and in favor of her sister, appellee Lori S. Allen, pursuant to Utah Code section 77–3a–101, *see* Utah Code Ann. § 77–3a–101 (2008). Specifically, Anger challenges the district court's underlying conclusion that she had committed the criminal offense of stalking, *see* Utah Code Ann. § 76–5–106.5 (2003) (amended 2008), a necessary prerequisite to the issuance of a civil stalking injunction under section 77–3a–101. We reverse.

## BACKGROUND

¶ 2 On November 27, 2007, Allen sought and obtained a temporary ex parte civil stalking injunction against Anger, alleging that Anger "ha[d] been involved in considera-

ble attempts at undermining [Allen's] parental rights and efforts to raise [her] children." The district court conducted two hearings on Allen's petition for a long-term civil stalking injunction, after which it entered its Amended Findings of Fact, Conclusions of Law, and Order on Hearing (the Injunction Order) on December 2, 2009. The testimony at the two hearings came primarily from Allen and Anger themselves.[1]

¶ 3 Allen's testimony detailed various incidents occurring between November 2006 and October 2007 that she claimed interfered with her parental rights and caused her emotional distress. The parties' conflicts began in early November 2006, when Allen sent her eldest daughter, sixteen-year-old C.R., to a teen ranch due to disciplinary problems. Anger, who had previously acted as a caregiver for C.R., strongly disagreed with Allen's decision.

¶ 4 Allen testified that Anger participated in distributing flyers around Allen's neighborhood, church, and workplace, directing readers to a website criticizing the teen ranch and Allen's decision to send C.R. there. The website contained detailed personal contact information for Allen and her husband, including their full names, addresses, home and work phone numbers, email addresses, and places of employment. The website also urged readers to contact the Allens to press for C.R.'s release from the teen ranch and to file complaints against the Allens with the Utah Attorney General's Office and Child Protective Services. As a result, Allen and her husband received harassing telephone calls, and Allen feared that she would lose her job and that her children were endangered.

¶ 5 Allen testified that Anger traveled to the teen ranch and encouraged C.R. to sign an emancipation petition that Anger had prepared. C.R. did so, resulting in a separate juvenile court proceeding. That proceeding was apparently dismissed after a stipulation whereby C.R. went to live with another of Allen's sisters in Washington state.

---

1. The only other witnesses were Allen's husband, Steve Allen, and Allen and Anger's brother, Na-than Richins, who each offered comparatively brief testimony.

¶ 6 Allen also testified that in June 2007, she had emailed Anger, directing Anger not to contact any of her four minor children. Anger continued to make contact with Allen's children, including several phone calls and text messages. Allen presented evidence that some of Anger's text messages included instructions for the children to delete them, presumably to prevent Allen's detection of the prohibited communications. Anger also visited Allen's home unexpectedly on August 26, 2007, and October 14, 2007, despite Allen's requests that Anger not contact her.

¶ 7 Anger's testimony largely confirmed the incidents described by Allen but cast them in a significantly different light. Anger testified that she had been Allen's children's primary caregiver for as many as nine years while Allen worked and went to night school. According to Anger, she received a phone call from Allen on October 30, 2006, wherein Allen stated that she had a physical altercation with her two oldest children, that the two children had run out of the house, that Allen was going to institutionalize herself, and that Anger's husband should come and pick up all four of Allen's children. Anger's husband did so, and the children stayed overnight with Anger and returned to Allen's home on October 31. Early the next morning, Allen had C.R. taken to the teen ranch. On November 5, Anger and her two brothers met with Allen at Allen's home and attempted to persuade Allen to bring C.R. home. This family meeting became quite emotional, with Anger and Allen yelling at each other and the two brothers expressing their opposition to Allen's decision.

¶ 8 Anger admitted some involvement with the flyers and website, and did not deny assisting C.R. with prosecuting her emancipation petition. Anger testified that after C.R. was released from the teen ranch, Anger and Allen and their families regularly interacted with each other. The families spent Christmas 2006 together, the Allen children attended a party at Anger's home a few days later, and Allen allowed C.R. and her next-youngest sibling to spend New Year's Eve night at Anger's home. Anger described several amicable social interactions between the two families in 2007, including a soccer game and ice skating in January, a February birthday party for Anger and Allen's father, a March baby shower and soccer game, a family Easter and birthday party in April, and hiking in April or May.

¶ 9 In May 2007, Anger and Allen both attended the blessing of one of their newborn nieces, at which time Allen and her husband blamed Anger for the husband's difficulties with Allen's children. Allen then invited Anger to a children's play in early June. The two sisters attended the play together, but it was awkward. A few days later, Anger received Allen's email directing her not to contact Allen's children. However, when Allen sent birthday presents to two of Anger's children in July and August, Anger wanted to reciprocate with birthday presents for one of Allen's children. After leaving multiple phone messages with Allen announcing her intentions, Anger visited Allen's home on August 26. Allen let Anger into the home and the two visited for over two hours, making plans for a children's sleepover in September.

¶ 10 On September 21, the day before the planned sleepover, Allen called Anger and cancelled the event. The two talked about how to heal their relationship, and Allen told Anger she would talk with her husband and get back to Anger on the subject. In October, Allen sent a birthday gift to another one of Anger's children, and on October 14, Anger and her children stopped by Allen's home to drop off other gifts. Unbeknownst to Anger, Allen and her husband were not home at the time. Anger was allowed into the house by Allen's children, but when Allen arrived home about ten minutes later, Allen told Anger she had to leave and Anger immediately did so.

¶ 11 After considering the parties' testimony, the district court entered an oral ruling granting Allen's petition. The district court commented,

> While a lot could be said—I make the final—these general observations, which I believe decide the matter of the petition. First of all, that which is paramount and large and has a looming impression in the case is the preparation of the flyers, and the institution of the website relative to the

response of [Allen] to place [C.R.] in the boot camp or the ranch.

I believe that that was not a small matter or a harmless matter, but a large and disturbing matter that constituted an assault on the parenting objectives of [Allen] regarding her daughter.

[Anger] takes a different view. That is in large part because of her own participation in caring and having ... a relationship as a relative to the minor child.

That decision to place [C.R.] in the ranch, boot camp was opposed by family members, but this Court has the opinion that while family members conduct their business in different ways, it's ultimately a parental decision. People are entitled to their opinions, but the action that was instituted was in the nature of an assault upon the parenting rights of [Allen].

The district court also noted that Allen and Anger had engaged in what it characterized as "reparative efforts ... to try to salvage the relationship and engage in family actions."

¶ 12 In its subsequent Injunction Order, the district court made the following conclusions of law:

6. The website and flyers are a disturbing matter to the Court because of the Petition for Emancipation filed in December 2006.

7. [Allen's] decision to seek treatment for [C.R.] at Turn–About Ranch was ultimately a decision that she had the right to make as [C.R.'s] parent. [Allen's] request that [Anger] not contact her children was also ultimately a decision that she had the right to make as a parent. [Anger's] actions were an assault on [Allen's] parental rights.

8. It is apparent to the Court that this matter involves an unfortunate family conflict that has been very emotionally straining to [Allen].

....[2]

13. [Anger's] course of conduct included multiple acts including: encouraging [C.R.]

to file emancipation papers; filling out emancipation forms for [C.R.]; unexpectedly coming to [Allen's] home on two (2) occasions despite [Allen's] request that [Anger] not communicate with her; and, entering [Allen's] home without her permission.

14. [Anger's] actions would cause any reasonable parent emotional distress.

15. [Anger's] actions clearly caused [Allen] severe emotional distress.

16. [Anger's] excuses for her actions are disingenuous, and thus, the Court finds that she intentionally and knowingly committed stalking against [Allen].

Based on these conclusions, the district court then entered a three-year civil stalking injunction prohibiting Anger from stalking Allen or contacting Allen, her husband, or her minor children. Anger appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 13 Anger argues that the district court erred in concluding that her actions constituted a criminal stalking offense because she did not engage in conduct or communication that could be construed as a threat. *See generally* Utah Code Ann. § 76–5–106.5 (2003) (amended 2008) (establishing the elements of the crime of stalking). "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion[s]." *Ellison v. Stam,* 2006 UT App 150, ¶ 16, 136 P.3d 1242 (alteration in original) (internal quotation marks omitted).

## ANALYSIS

■ ¶ 14 Utah Code section 77–3a–101 allows for the entry of a civil stalking injunction upon a district court finding that "an offense of stalking has occurred." Utah Code Ann. § 77–3a–101(5) (2008). Allen sought and received her injunction under section 77–3a–101, and thus, the injunction required a finding that Anger's conduct violated Utah's criminal stalking statute, Utah

---

**2.** The omitted paragraphs contained the statutory requirements for obtaining a civil stalking injunction, the relevant elements of the crime of

stalking, and the definitions of the terms "course of conduct" and "repeatedly."

Code section 76–5–106.5, as it existed at the time of that conduct. *See generally* Utah Code Ann. § 76–5–106.5 (2003) (the 2003 stalking statute).[3] The district court determined that Anger had violated the 2003 stalking statute by engaging in a course of conduct that caused Allen emotional distress. On appeal, Anger argues that her conduct was not sufficiently threatening to have violated the 2003 stalking statute.

¶ 15 The 2003 stalking statute only applied to persons who engaged in a statutorily-defined course of conduct by "repeatedly maintaining a visual or physical proximity to a person or repeatedly conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person." *Id.* § 76–5–106.5(1)(a). Such a course of conduct only violated the 2003 stalking statute if it "would cause a reasonable person: (i) to fear bodily injury to himself or a member of his immediate family; or (ii) to suffer emotional distress to himself or a member of his immediate family." *See id.* § 76–5–106.5(2)(a). Here, the district court found that Anger had violated the 2003 stalking statute solely by inflicting emotional distress upon Allen.

█ ¶ 16 Utah case law makes clear that the degree of emotional distress that will support a stalking offense must be much greater than mere "anxiety or annoyance." *See Salt Lake City v. Lopez,* 935 P.2d 1259, 1264 (Utah Ct.App.1997). This court has interpreted the emotional distress element of the 2003 stalking statute to be synonymous with the level of emotional distress necessary to establish the tort of intentional infliction of emotional distress (IIED). *See id.* Such "[e]motional distress results from conduct that is 'outrageous and intolerable in that it offends the generally accepted standards of decency and morality.'" *Id.* (quoting *Russell v. Thomson Newspapers, Inc.,* 842 P.2d 896, 905 (Utah 1992)).[4]

> To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair. Conduct is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal. The liability [for] [IIED] clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Bennett v. Jones, Waldo, Holbrook & McDonough,* 2003 UT 9, ¶ 64, 70 P.3d 17 (first alteration in original) (citations and internal quotation marks omitted).

¶ 17 Because Anger's stalking offense was premised on Allen's emotional distress rather than any fear of bodily injury, Anger's argu-

---

**3.** In 2008, the legislature enacted numerous substantive amendments to Utah Code section 76–5–106.5. *See* Utah Code Ann. § 76–5–106.5 amend. notes (2008). We refer to the current version of the stalking statute, which was not in effect at the time of Anger's conduct, as the 2008 stalking statute.

By way of background, we note that the 2003 stalking statute was substantially based on a model anti-stalking code promulgated by the National Institute of Justice (the 1993 Model Code). *See* National Inst. of Justice, U.S. Dep't of Justice, *Project to Develop a Model Anti–Stalking Code for States* (1993). The 2008 amendments adopted certain provisions recommended by a new model code (the 2007 Model Code). *See* Utah Code Ann. § 76–5–106.5 (2008); *see also* National Ctr. for Victims of Crime, *The Model Stalking Code Revisited* (2007). Both the 1993 Model Code and the 2007 Model Code contain extensive commentaries on their various provisions. Although this case does not require the interpretation of the text of either the 2003 or the 2008 stalking statute, we note that the model code commentaries may provide useful guidance in interpreting Utah's statutes based on the model codes. *See Regional Sales Agency, Inc. v. Reichert,* 830 P.2d 252, 255–56 (Utah 1992) (employing commentary to Model Code of Judicial Conduct to interpret similar provision of Utah Code of Judicial Conduct); *State v. Bush,* 2001 UT App 10, ¶ 15, 47 P.3d 69 (employing commentary to the Model Penal Code to interpret similar Utah criminal statute); *see also State v. Warbelton,* 2009 WI 6, ¶¶ 35–39, 315 Wis.2d 253, 759 N.W.2d 557 (looking to the 1993 Model Code's commentary in interpreting Wisconsin's anti-stalking statute based thereon).

**4.** We note that the 2008 stalking statute explicitly defines emotional distress as "significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required." *See* Utah Code Ann. § 76–5–106.5(1)(d) (2008). Whether this definition is intended to overrule the outrageousness requirement imposed by *Salt Lake City v. Lopez,* 935 P.2d 1259 (Utah Ct.App.1997), and whether it would be effective in doing so, are questions beyond the scope of today's decision.

ment that her actions were not sufficiently threatening to violate the 2003 stalking statute is essentially a claim that her actions would not cause the requisite degree of severe emotional distress in a reasonable person. Thus, under *Salt Lake City v. Lopez,* 935 P.2d 1259 (Utah Ct.App.1997), we consider Anger's argument on appeal in terms of whether her conduct was so outrageous and intolerable as to support a tort claim for IIED. *See id.* at 1264.

¶ 18 Utah cases addressing varying factual circumstances have been confusing when answering the question of when, as a matter of law, behavior is sufficiently outrageous to present a jury question on an IIED claim. *Compare Cabaness v. Thomas,* 2010 UT 23, ¶ 37, 232 P.3d 486 (rejecting "the position that the failure to prevent another from inflicting emotional anguish gives rise to a valid claim of [IIED]"), *Prince v. Bear River Mut. Ins. Co.,* 2002 UT 68, ¶¶ 37–40, 56 P.3d 524 (holding that insurance company's refusal to pay benefits was not outrageous as a matter of law if the company's actions were "fairly debatable"), *and Nguyen v. IHC Health Servs., Inc.,* 2010 UT App 85, ¶¶ 8–9, 232 P.3d 529 (holding that defendants' failure to follow testing protocols for use of a ventilator on a child did not, under the circumstances of the case, "amount[ ] to evidence of outrageous conduct"), *with Cabaness,* 2010 UT 23, ¶¶ 40–45, 232 P.3d 486 (reversing summary judgment on IIED claim where plaintiff's supervisor engaged in "an ongoing and continuous pattern of abusive, intimidating, and harassing behavior"), *Retherford v. AT & T Commc'ns,* 844 P.2d 949, 975–76, 978 (Utah 1992) (allowing IIED claim to go to a jury on plaintiff's allegations of "months of persecution by her co-workers" where they "shadowed her movements, intimidated her with threatening looks and remarks, and manipulated circumstances at her work in ways that made her job markedly more stressful, all in retaliation for her good-faith complaint of sexual harassment"), *and Sorensen v. Barbuto,* 2006 UT App 340, ¶ 21, 143 P.3d 295 (allowing IIED action where plaintiff's former physician "not only communicated ex parte with defense counsel [but] actually became a paid advocate for [plaintiff]'s adversary"), *aff'd,* 2008 UT 8, 177 P.3d 614.

¶ 19 There appears to be no Utah case law directly addressing the question of when and whether interference with parental rights can cause sufficient emotional distress to support an IIED claim. Perhaps the closest factual match comes in *Gulbraa v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints,* 2007 UT App 126, 159 P.3d 392, wherein the plaintiff alleged that church officials "conspired with federal fugitives . . . to interfere with [his] custodial and parental rights" by concealing the whereabouts of the plaintiff's children, *see id.* ¶ 20. However, due to its procedural posture, *Gulbraa* is of limited utility to resolving the question before us. *Gulbraa* did reverse the granting of a motion to dismiss the plaintiff's IIED claim despite the defendant's argument that its conduct was not outrageous as a matter of law. *See id.* ¶¶ 23–24. But we noted, "[O]ur decision here does not mean that Plaintiff's claim for [IIED] would not be subject to summary judgment disposition. It simply requires the discovery process to proceed and allows Plaintiff an opportunity to further develop his case." *Id.* ¶ 24 n. 3.

¶ 20 We have little doubt that in an appropriate case, interference with parental rights could cause the kind of severe emotional distress necessary to maintain an IIED action or subject the actor to criminal liability under the 2003 stalking statute. However, we are reluctant to expand the scope of either tort or criminal law to encompass intrafamily disagreements over child rearing decisions merely because those disagreements can cause emotions to run high. *See generally Oman v. Davis Sch. Dist.,* 2008 UT 70, ¶ 51, 194 P.3d 956 ("Due to the highly subjective and volatile nature of emotional distress and the variability of its causations, the courts have historically been wary of dangers in opening the door to recovery therefor." (internal quotation marks omitted)); *Hatch v. Davis,* 2006 UT 44, ¶ 32, 147 P.3d 383 ("[W]e support the rigorous scrutiny applied to attempts to expand the reach of [IIED]."). To the contrary, it seems to us that the potential for emotional distress is so omnipresent in family matters and other intimate areas of the human experience that criminal or civil liability should lie only in the

most extreme of circumstances. *Cf. Schuurman v. Shingleton*, 2001 UT 52, ¶ 25, 26 P.3d 227 ("However unpleasant, the emotional distress that plaintiff alleges she suffered [from defendant's false promises of marriage and financial security] is indistinguishable from that commonly suffered by others when an intimate personal relationship fails.").

¶ 21 With these precepts in mind, we turn to evaluating Anger's actions to determine if she engaged in repeated acts of outrageous behavior in violation of the 2003 stalking statute. In our opinion, the incident involving the distribution of flyers is the most outrageous act undertaken by Anger. Even without considering any impact on Allen's parental rights, the flyer distribution incident is disturbing on a number of levels: Anger distributed the flyers around Allen's neighborhood, church, and workplace; the website referenced in the flyers contained detailed personal contact information for Allen and her husband, including their full names, addresses, home and work phone numbers, email addresses, and places of employment; the flyers and website urged readers to contact the Allens and to file complaints against the Allens with authorities; Allen and her husband actually received harassing telephone calls as a result; and the district court determined that Anger's excuses for her actions were "disingenuous." However, we need not determine if the flyer distribution incident is outrageous under *Lopez* because Anger's other actions in this case clearly do not rise to the level of outrageousness necessary to support a stalking violation based on infliction of emotional distress.

¶ 22 A single incident, no matter how outrageous, cannot constitute a course of conduct for purposes of the 2003 stalking statute. Instead, that statute speaks in terms of *"repeatedly* conveying verbal or written threats or threats implied by conduct or a combination thereof directed at or toward a person." Utah Code Ann. § 76–5–106.5(1)(a) (2003) (emphasis added).[5] Thus, even if we were to conclude that the flyer distribution

incident was outrageous under *Lopez,* the district court's conclusion that Anger violated the 2003 stalking statute could not stand unless Anger had committed at least one more outrageous act directed at Allen. We are not convinced that any of Anger's subsequent actions rise to the severe and outrageous level necessary to violate the 2003 stalking statute, even when considered in the context of Anger's prior behavior. *See generally Ellison v. Stam,* 2006 UT App 150, ¶ 25–33, 136 P.3d 1242 (requiring each act in a course of conduct to be evaluated in the context of what has gone before).

¶ 23 Anger's participation in C.R.'s filing of an emancipation petition is consistent with Utah law providing that a minor may petition the district court for a declaration of emancipation. *See* Utah Code Ann. § 78A–6–803 (2008). We cannot fault Anger for assisting C.R. in doing something that Utah law expressly allowed C.R. to do. The very existence of an emancipation process may conflict with the idea of parental rights, but the source of that conflict is the legislature's decision to create such a process, not the child who attempts to take advantage of the process or an adult family member who may assist her.

¶ 24 The other actions alleged by Allen in support of her injunction petition are even less capable of characterization as outrageous. Allen alleged that Anger, a close family member, had contacted Allen's minor children against her wishes,[6] come to her home unexpectedly on two occasions, and entered her home without her permission, yet none of these activities are particularly extreme or outrageous when taken in context. There is no indication that Anger's communications were unwelcome by the Allen children, and one of Anger's visits resulted in Allen allowing Anger into her home for an extended conversation. As for the other visit, it appears that Anger was allowed into the home by Allen's children and left immediately when asked to by Allen.

---

5. The 2003 stalking statute defines "repeatedly" as "on two or more occasions." *See* Utah Code Ann. § 76–5–106.5(1)(c) (2003) (amended 2008).

6. Allen presents no authority for her implicit proposition that parents may prohibit others from communicating with their children upon pain of legal liability.

¶ 25 Thus, even assuming that the flyer incident was sufficiently outrageous to support a violation of the 2003 stalking statute, there is no second outrageous act by Anger to support the conclusion that she "repeatedly" threatened Allen with emotional distress. Without repeated acts, there is no "course of conduct" and no violation of the 2003 stalking statute. *See Ellison*, 2006 UT App 150, ¶ 28, 136 P.3d 1242 ("Stalking, by its very nature, is an offense of repetition."). As Anger's actions did not constitute criminal conduct under the 2003 stalking statute, they cannot serve as the basis for a civil stalking injunction pursuant to Utah Code section 77–3a–101. The district court erred when it concluded to the contrary.

## CONCLUSION

¶ 26 The 2003 stalking statute criminalized repeated conduct that, among other requirements, would cause a reasonable person to suffer emotional distress. However, such conduct must have been "outrageous and intolerable in that it offends the generally accepted standards of decency and morality." *See Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct.App.1997) (internal quotation marks omitted). Anger's actions, while clearly undesired by Allen, did not include repeated outrageous acts and, thus, did not violate the 2003 stalking statute. Accordingly, we reverse the district court's civil stalking injunction, which was premised on Anger's violation of the 2003 stalking statute.

¶ 27 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge, and MICHELE M. CHRISTIANSEN, Judge.