**2022 UT App 45**

## THE UTAH COURT OF APPEALS

SERGIO CORONA-LEYVA,
Appellee,
*v.*
JESUS HARTMAN,
Appellant.

Opinion
No. 20200948-CA
Filed April 7, 2022

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 200401402

Sara Pfrommer, Ronald D. Wilkinson, and Nathan S.
Shill, Attorneys for Appellant

Sergio Corona-Leyva, Appellee Pro Se

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1 Sergio Corona-Leyva obtained a civil stalking injunction against Jesus Hartman. By statute, the district court was required to determine that Hartman's "course of conduct" "would cause a reasonable person . . . to fear for the person's own safety or the safety of a third person." Utah Code Ann. § 76-5-106.5(2) (LexisNexis Supp. 2021).[1] And in *Baird v. Baird*, 2014 UT 08, ¶ 26, 322 P.3d 728, the supreme court emphasized that a district court

---

1. Because there have been no substantive changes to the relevant statutory provisions, we cite to the current version of the Utah Code for the reader's convenience.

must apply an "individualized objective standard" to this element.

¶2     In granting the injunction in this case, however, the district court found that the fear element had been met because of the subjective fears of Corona-Leyva and his neighbor. We accordingly reverse and remand so that the court can apply the correct standard.

BACKGROUND[2]

¶3     Utah Code section 78B-7-701 outlines the process for obtaining a civil stalking injunction. First, "an individual who believes that the individual is the victim of stalking may file a verified written petition for a civil stalking injunction against the alleged stalker." Utah Code Ann. § 78B-7-701(1)(a) (LexisNexis Supp. 2021). A district court can then issue "an ex parte civil stalking injunction" if "the court determines that there is reason to believe that an offense of stalking has occurred." *Id.* § 78B-7-701(3)(a). "Within 10 days after the day on which" the "ex parte civil stalking injunction is served, the respondent is entitled to request, in writing, an evidentiary hearing on the civil stalking injunction." *Id.* § 78B-7-701(4). At the evidentiary hearing, "the court may modify, revoke, or continue the injunction. The burden is on the petitioner to show by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." *Id.* § 78B-7-701(5).

---

2. "On appeal, when a trial court has made findings of fact to support a civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Sheeran v. Thomas*, 2014 UT App 285, ¶ 2 n.1, 340 P.3d 797. We accordingly do not recite the evidence offered by Hartman, "which was mostly contrary to the findings made by the court." *Id.*

¶4    In September 2020, Sergio Corona-Leyva petitioned for a civil stalking injunction against Jesus Hartman, who was dating Corona-Leyva's estranged wife. The petition covered both Corona-Leyva and his daughter (Daughter). After Corona-Leyva filed his petition, the district court granted an ex parte civil stalking injunction against Hartman, and the injunction covered both Corona-Leyva and Daughter. Hartman then timely requested an evidentiary hearing.

¶5    The court held the evidentiary hearing in November 2020. At that hearing, Corona-Leyva represented himself and presented testimony from, among others, his neighbor, Daughter, and himself. These witnesses each corroborated Corona-Leyva's claim that Hartman was stalking him.

¶6    For example, Corona-Leyva's neighbor testified that she had "seen [Hartman] on numerous occasions sitting out in front of [her] house, down [her] street." She said that she "called [the police] on numerous occasions due to the fact that [she didn't] feel safe with him just sitting out there." The neighbor also explained that when she first saw Hartman, she had "no idea who he was" and that she didn't "feel comfortable having just a random car sitting" on her street "by where [her] kids [were] playing."

¶7    The court asked the neighbor "how many times before September 8" she had "notice[d] him before [she] finally called the police." The neighbor responded, "Probably at least 20 times." When the court asked her how many times she had seen Hartman since calling the police on September 8, 2019, she replied, "Numerous times. I would say easily 25, 30 times." She also explained that although she hadn't seen Hartman "as much" in the "past few months," she had "still . . . seen him drive through."

¶8    The court also questioned the neighbor about how she knew it was Hartman "when he's just driving by." The neighbor explained that "there's suspicious behavior that he does, where

he pulls up next to [her] house, will sit there for 10, 15 minutes, and then slowly creep down the road, and then race down past." She said that "[a] lot of the times he does have windows open, a lot of times he has his music blaring." The neighbor also identified Hartman, who was present for the virtual hearing, as "the same one who sat out in the cars."

¶9 Daughter testified next. She explained that she lived with her dad (Corona-Leyva), and that she didn't have parent-time with her mom (who was living with Hartman) because Hartman "just [didn't] make [her] feel safe." Daughter also testified that she had seen Hartman "park and drive by" her dad's house "[a] lot of times." When the court asked if Hartman was driving by Corona-Leyva's house to visit her, Daughter said, "No." Daughter also explained that she knew it was Hartman driving by because he drives "kind of like crazy, or he just like slowly drives past and stops." She additionally testified that his driving was "really suspicious." But when the court asked if she "need[ed] a stalking injunction" against Hartman, Daughter responded, "No."

¶10 Corona-Leyva testified next, explaining that Hartman used to drive by his house "every other day" and would park outside his house "numerous time[s] half an hour to an hour." He also testified that there was no reason for Hartman to be on his street because "it's a dead end" and because Hartman didn't need to drop off Corona-Leyva's children. He further explained that Hartman continued to come to his house "all the time," even after Corona-Leyva's wife and other children moved in with Hartman.

¶11 After Corona-Leyva presented his case, Hartman called several witnesses, including his parents, his sister, himself, and a licensed clinical psychologist. In contrast to Corona-Leyva's witnesses, Hartman's witnesses testified that Hartman was afraid of Corona-Leyva and that Hartman only went to Corona-Leyva's house to pick up his girlfriend and her children.

¶12 After each side presented its witnesses and gave closing arguments, the district court issued an oral ruling from the bench. The court first explained that it was "going to grant the stalking injunction, with one modification"—it removed Daughter as "a protected party." The court stated that it was removing Daughter because there was no evidence that she was "threatened, harassed, monitored, surveilled, that kind of thing."

¶13 The court then recited the "elements of stalking" from the stalking statute. Of note here, these include a determination that the alleged stalker "intentionally or knowingly engage[d] in a course of conduct directed at a specific person" and that the alleged stalker "knows or should know that the course of conduct would cause a reasonable person: (a) to fear for the person's own safety or the safety of a third person; or (b) to suffer other emotional distress." Utah Code Ann. § 76-5-106.5(2).

¶14 The court found that the course of conduct element was "easily satisfied with two or more acts"—namely that "Hartman has parked outside and driven past [Corona-Leyva's] home many times." The court expressed its view that this element was "easily" established by the neighbor's testimony that she had seen Hartman "at least 20 times before calling the police and at least 25 to 30 times after calling the police."

¶15 The court then addressed whether Hartman's conduct "would cause a reasonable person . . . (a) to fear for the person's own safety or the safety of a third person; or (b) to suffer other emotional distress." *Id.* The court stated that

> [e]motional distress has been emphasized by [Corona-Leyva], and it's true that [Corona-Leyva] has not adduced much evidence on that issue, although he did establish that he bought a ring doorbell specifically for this purpose, which tends to indicate some emotional distress. But even so, the

emotional distress requirement is not necessary here. What [Corona-Leyva] has satisfied, again, overwhelmingly, is the fear for the safety of self or another.

¶16 When describing how Corona-Leyva demonstrated "fear for the safety of self or another," the court referred to the neighbor's testimony. As recounted in the transcript, the court stated that

> [t]he fact that a neighbor who has no connection to these parties had enough fear for her safety and the safety of her child to call the police, this easily establishes and corroborates [Corona-Leyva's] expression that he fear[ed] for his own safety than that of another. That namely Daughter was who he was concerned for.

The court continued that "[j]ust having a vehicle parked outside of your home that frequently at odd hours of the day and night is enough to cause fear for the safety of one's self or another."

¶17 Based on these findings, the court entered a civil stalking injunction against Hartman and in favor of Corona-Leyva. Hartman timely appealed.

ISSUE AND STANDARD OF REVIEW

¶18 On appeal, Hartman argues that the district court misapplied the stalking statute "to the facts and circumstances of this case." "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusions." *Ellison v. Stam*, 2006 UT App 150, ¶ 16, 136 P.3d 1242 (quotation simplified).

ANALYSIS

¶19   Hartman claims that the district court "incorrectly applied the 'fear for one's safety' element" of the stalking statute. We agree.

¶20   A district court may enter a civil stalking injunction if it concludes that the alleged stalker's "conduct violated Utah's criminal stalking statute, Utah Code section 76-5-106.5." *Allen v. Anger*, 2011 UT App 19, ¶ 14, 248 P.3d 1001.

¶21   Under the criminal stalking statute,

> (2) A person is guilty of stalking who intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person:
>
> (a) to fear for the person's own safety or the safety of a third person; or
>
> (b) to suffer other emotional distress.

Utah Code Ann. § 76-5-106.5(2) (LexisNexis Supp. 2021).

¶22   A "reasonable person" is "a reasonable person in the [petitioner's] circumstances." *Id.* § 76-5-106.5(1)(d). This statute accordingly uses an "objective standard" for this element. *Baird v. Baird*, 2014 UT 08, ¶ 25, 322 P.3d 728. This means that "the subjective effect of the respondent's conduct on the petitioner is irrelevant." *Id.* But our supreme court has also clarified that the question for this element is whether "the respondent's conduct would cause emotional distress [or fear] to a reasonable person in the petitioner's circumstances." *Id.* In this sense, the element is analyzed under "an individualized objective standard." *Id.* ¶ 26.

¶23    In past cases, the supreme court has vacated injunctions based on courts' failures to either apply an objective standard at all or instead to apply the individualized gloss to that objective standard. In *Baird*, for example, the court vacated an injunction because the district court had improperly focused on whether the conduct was "subjectively causing" the petitioner "distress." *Id.* ¶ 28 (quotation simplified). And in *Ragsdale v. Fishler*, 2021 UT 29, ¶¶ 44, 48, 491 P.3d 835, the supreme court vacated an injunction because the district court had failed to consider the "entire context surrounding" the conduct and its impact "not just on a reasonable person, but a reasonable person" in the petitioner's "specific circumstances."

¶24    The district court here likewise applied the wrong standard. As noted, the court determined that Corona-Leyva had "overwhelmingly" demonstrated "fear for the safety of self or another." But when describing the basis for this determination, the court stated that the

> fact that *a neighbor* who has no connection to these parties had enough fear for her safety and the safety of her child to call the police, this easily establishes and corroborates [Corona-Leyva's] expression that *he* fear[ed] for his own safety than that of another. That namely [Daughter] was who *he* was concerned for.

(Emphases added.)

¶25    The court thus appears to have determined that the injunction was warranted based on the subjective fears of two people: Corona-Leyva and his neighbor. In doing so, the court therefore erred by using a "subjective analysis," rather than the "individualized objective standard" required by *Baird*. In light of

this, "we remand so the district court can apply the correct standard." *Ragsdale*, 2021 UT 29, ¶ 49.[3]

¶26　Given the likelihood that this will be further litigated on remand, we make two additional observations. *Cf. Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 47, 493 P.3d 632 (noting an appellate court's ability to "provide additional guidance on issues that are likely to recur on remand").

¶27　First, while advancing his legal argument, Hartman at least arguably makes a factual challenge of his own to the court's ruling, contending that there was "no evidence in the record" that Corona-Leyva was "in fear of his own safety or the safety of others." If Hartman means to advance this as a separate ground for relief, we note that he has made the same error that he faults the district court for making: he improperly focuses on Corona-Leyva's subjective fear (or lack thereof), as opposed to whether a

---

3. At one point during its oral ruling, the court did surmise that "having a vehicle parked outside of your home that frequently at odd hours of the day and night is enough to cause fear for the safety of one's self or another." In isolation, this might be read as an oblique reference to an objective standard, rather than a subjective one. But even so, the court did not then indicate whether it was assessing this "in light of the specific facts and circumstances of [Corona-Leyva's] individual case," *Ragsdale v. Fishler*, 2021 UT 29, ¶ 48, 491 P.3d 835, so this would still violate our supreme court's call for an "individualized objective standard." *Baird v. Baird*, 2014 UT 08, ¶ 26, 322 P.3d 728. And in any event, this was a passing comment. In the full context of the court's other statements, we understand the court to have based its ruling on the subjective fears of Corona-Leyva and his neighbor, rather than a determination that the element had been met under the individualized objective standard required by *Baird*.

reasonable person in Corona-Leyva's circumstances would have had such fear.

¶28 Second, if Hartman means to instead suggest that there's no evidence from which the court could find that a reasonable person in Corona-Leyva's circumstances would have any such fear, we note our disagreement with Hartman's unduly restrictive approach to the evidence. In his brief, for example, Hartman contends that the neighbor's testimony could not be relevant to the court's analysis of the fear element. In a similar vein, Hartman suggests that the court's assessment of that element should be limited to very recent events.

¶29 But *Baird* itself recognized that the "individualized objective standard" allows a district court to look at a variety of factors, including "the victim's background," "the victim's knowledge of and relationship with the defendant," "any history of abuse between the parties," "the location of the alleged stalking and its proximity to the victim's children," "the cumulative effect" of "repetitive conduct" by the respondent, and "any other relevant factors." 2014 UT 08, ¶ 27. And this holistic approach is likewise consistent with *Ragsdale*'s insistence that a district court should consider the "entire context surrounding" the conduct when making the fear determination under the individualized objective standard. 2021 UT 29, ¶¶ 44, 48.

¶30 Here, the neighbor testified that she saw Hartman drive by "at least 20 times" before calling police and "easily 25, 30 times" after calling the police. Hartman fails to even acknowledge this testimony in his brief, let alone account for it. And although this testimony came from the neighbor, it could certainly be used in conjunction with testimony from any other witness to establish what Hartman had actually done—which could then inform the court's assessment of, among other factors, the "history of abuse" between the parties and the "cumulative effect" of any "repetitive conduct." As noted, both of these can be relevant to the court's

assessment of whether Hartman's behavior would cause fear in a reasonable person in Corona-Leyva's circumstances. *See Baird*, 2014 UT 08, ¶ 27.[4]

CONCLUSION

¶31   The district court misapplied the stalking statute when it focused on the subjective fears of Corona-Leyva and his neighbor. We therefore reverse and remand so that the district court can determine whether Hartman's conduct would cause a reasonable person in Corona-Leyva's circumstances to suffer fear for self or another.

———————

4. At the close of his brief, Hartman also argues that the "district court committed numerous procedural errors" that "collectively taint[ed]" its ruling. But while Hartman then points to five alleged errors, he doesn't cite a single case or rule to support any of these claims, let alone meaningfully develop any legal argument about why the court erred in any of these respects. As a result, Hartman has not carried his burden of persuasion on appeal with respect to any of them. *See* Utah R. App. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal."); *see also In re L.A.*, 2017 UT App 131, ¶ 18, 402 P.3d 69 (holding that the appellant had "not carried his burden of persuasion on appeal" when he failed to "cite[] any authority" or "provide[] any legal analysis in support of his argument").